HON. HENRY McIVER, CHIEF JUSTICE.
HON. YOUNG J. POPE, ASSOCIATE JUSTICE.
HON. EUGENE B. GARY, ASSOCIATE JUSTICE.
HON. IRA B. JONES, ASSOCIATE JUSTICE.

## SEGARS v. PARROTT.

1. NEW COUNTIES.—Constitutional and statutory provisions as to the formation of new counties stated.

2. IBID.—ELECTIONS.—The result of an election on the establishment of a new county can only be determined by the canvass of the returns of the managers, in the same way that such returns in general elections are canvassed.

3. IBID.—IBID.—LEGISLATURE—CONSTITUTION — STATUTES.—Section 5 of 22 Stat., 64, construed to mean that the legislature is limited in determining the result of an election on the formation of a new county to ascertaining whether such result has been obtained as provided in sections 3 and 4. Rule of construction as to statutes alleged to be unconstitutional stated. *Mr. Justice Jones and Judges Buchanan and Townsend dissent.*

4. IBID.—LEGISLATURE—CONSTITUTION.—If section 5 of the act of 1896 (22 Stat., 64,) be construed to mean that the legislature may judicially

1—54

determine the result of an election for the establishment of a new county, it must be held unconstitutional.

5. IBID.—ELECTIONS—APPEAL.—Does an appeal lie from the board of county canvassers to the State board of canvassers in an election on the establishment of a new county?

6. ELECTIONS—BOARDS OF CANVASSERS.—REMEDIES suggested against the return of boards of canvassers, if illegal or erroneous as matter of law, or if fraudulent.

7. *Dissenting* opinion of Mr. Justice Jones *concurred* in by Judge Townsend, as to construction of sec. 5 of 22 Stat., 64.

8. *Dissenting* opinion of Judge Buchanan, in which is discussed: (a) Dissent to construction of sec. 5 of 22 Stat., 64. (b) That there is no ground for injunction. (c) That this Court has no jurisdiction of this case. (d) That the Court, *en banc*, must decide whole case, and not isolated portions selected by Supreme Court.

9. LEE COUNTY.—The act creating Lee County, 22 Stat., 908, declared unconstitutional.

Proceeding in original jurisdiction for injunction by the following petition:

The State of South Carolina, in the Supreme Court. April term, 1898. J. R. Segars, jr., J. J. Fields, S. T. Gardner, R. M. Jones, B. R. Gatlin, and R. M. Cooper, petitioners, against J. L. Parrott, John C. Shaw, J. P. Kilgo, E. E. Tiller, A. E. Skinner, A. M. Lee, R. E. Carns, W. W. Heron, J. W. Gardner, J. E. McCutchen, S. F. Moore, and Wm. Kelley, as commissioners of Lee County, respondents.

To the Honorable Chief Justice and Associate Justices of the Supreme Court of South Carolina: The plaintiffs above named, who bring this action as well for themselves as for all others, citizens of the territory embraced within the boundaries of the so-called county of Lee, as may come and contribute to the expenses of this action, petition and say:

1. That within less than two years last past, certain citizens of the counties of Sumter, Darlington, and Kershaw, in said State, filed their petitions with the governor of this State, praying for the creation of a new county from the three counties above named, and showing compliance with the requirements of sections 1 to 6, inclusive, of article VII. of the Constitution of this State, and of the act of the legis-

lature regulating the formation of new counties.   The boun-
daries of the said proposed new county were described in
said petition as follows, that is to say : In the old county of
Darlington : "Beginning at a point on Lynch's River, where
the Darlington and Chesterfield County line intersects with
said river; thence up said county line 7½ miles; thence due
south to the head of Sparrow Swamp; thence down said
swamp to the crossing of the M. & A. Railroad; thence S.
30 W. to Lynch's River; thence down said river to Sander's
Bridge."   In the old county of Sumter : "Beginning at San-
der's Bridge, on Lynch's River; thence from Sander's
Bridge S. to W. to Black River; thence due west to the M.
& A. Railroad, near Wheeler's Mill; thence down south side
of said railroad to Scape O'er Swamp; thence up said
swamp to McGrit's Branch; thence up said branch to Me-
chanicsville; thence due west to public road leading from
Sumter to Camdén; thence up said road to the Sumter and
Kershaw County line; thence up said county line to Beaver
Dam Branch."   In the old county of Kershaw : "Begin-
ning at Beaver Dam Branch, on the Sumter and Kershaw
County line; thence up said branch to the 10-mile post on
the public road leading from Bishopville to Camden; thence
N. 10 W. to the 9-mile post on the public road leading from
Stokes' Bridge, on Lynch's River, to Camden; thence N. 20
W., crossing the Tiller's Ferry Road near the 10-mile post;
thence N. 20 W. to the 'Wire Road;' thence along said road
to Lynch's River, at Young's Bridge; thence down said
river to its intersection with the Darlington and Chester-
field County line."

2. That in compliance with the prayer of said petitions
and with the requirements of law, the election prayed for
was afterwards ordered by the governor of this State and
held, and the result of said election was declared to be that
the said proposed new county had failed to receive the requi-
site number of favorable votes in all of the three sections of
the three counties, respectively, embraced within the said
three old counties.   The name proposed for said new county

was "Salem County," which will be hereinafter so called as a designation of said proposed new county.

3. The said Salem County was never created and established by any act of the General Assembly.

4. That thereafter, certain citizens of the same counties of Sumter, Darlington, and Kershaw, in said State, filed their petitions with the governor of this State, praying for the creation of a new county from the three counties in this section above named, which petition showed on its face compliance with the requirements of sections 1 to 6 inclusive of article VII. of the Constitution of this State and of the act of the legislature regulating the formation of new counties. The boundaries of said proposed new county were as follows: "Section 1. That a new judicial and election county to be known as Lee County is hereby formed, with the following boundaries, to wit: Beginning at a point 2⅓ miles below DuRant's Bridge, on Lynch's River, running from said point to a due west line crossing the W., C. & A. R. R. to the M. & A. R. R. at Wheeler's Mill; thence along the south side of the said M. & A. R. R. a distance of three miles; thence north forty degrees W. to the Bradford Springs Road; thence due west to the Camden and Sumter Road, and along said road to the Kershaw County line; thence up said county line to Beaver Dam Branch; then up said branch to the 10-mile post on the public road leading from Bishopville to Camden; thence north 10 degrees west to the 9-mile post on the public road leading from Tiller's Ferry, on Lynch's River, to Camden; thence east along said road to Tiller's Cross Roads; thence due east to a point on Lynch's River, one mile above Tiller's Ferry, on said river; thence to a point where the dividing line between Darlington and Chesterfield Counties touches Lynch's River; thence along said dividing line 7½ miles to a point; thence due south to the head of Sparrow Swamp, near Liberty Hill Church; thence down said swamp to a point where the line dividing Lamar and Cypress Townships intersect Sparrow Swamp; thence up said dividing line to Lynch's River; thence down

said river to the beginning point; and the county seat is hereby established at Bishopville."

5. That in compliance with the prayer of said petitions and with the requirements of law, the election so prayed for was afterwards ordered by the governor and held, and the result of said election, in the sections of the counties of Sumter and Kershaw, respectively, embraced within the area of said new county, was, as reported by the managers of election within said areas, and as declared by the commissioners of election for said two old counties, favorable to the creation of said new county; but the result of said election in the county of Darlington, embraced within the area of said new county, was, as returned by the managers of election within said last named area, and as declared by the commissioners of election for said old Darlington County, unfavorable to the creation of said new county, in that, as so reported and declared, it failed to obtain two-thirds of the qualified electors of said embraced area of Darlington County in favor of such new county. The name proposed for said last mentioned new county was "Lee County," which will be hereinafter so called as a designation of said proposed new county.

6. That the result of said last mentioned election was certified in legal form by the commissioners of election for said three old counties to the secretary of State, and by him was submitted to the General Assembly at its next session—all of which proceedings were conformable to law.

7. That the General Assembly, at its said session, passed an act, which was entitled "An act to establish Lee County," and said act was duly approved by the governor on the 19th day of February, 1898. The said act of Assembly purports to create and establish the said county of Lee, designating the same boundaries as are set forth in paragraph four of this petition, providing for the election of county officers and others at the general election in November next, locating it in the Third Circuit and in the Seventh Congres-

sional District, and making other provisions for the full operation of a county government.

That the said act also contains the following provisions: "Section 2. That J. L. Parrott, Jno. C. Shaw, J. P. Kilgo, E. E. Tiller, A. E. Skinner, A. M. Lee, R. E. Carns, W. W. Heron, J. W. Gardener, J. E. McCutchen, S. F. Moore, and Wm. Kelley are hereby appointed commissioners for said county of Lee, and they and their successors in office are hereby authorized to have the boundaries of said new county marked as now surveyed, and to provide a court house and jail by the erection of suitable buildings at the county seat, and to receive and accept in the name and for the new county of Lee any bonds, money, lands or other gifts donated or hereafter given to have erected the said public buildings. *Provided,* That when the supervisor for said county is elected and qualified, and county commissioners are appointed and qualified, the above named commissioners shall turn over to the county board of commissioners, all the public buildings, if then completed, and, also, all bonds, obligations, lands or money in their hands and belonging to the said county of Lee, and then their powers and duties shall cease, and the county board of commissioners shall succeed to all the rights and powers of said commissioners."

9. That the said Salem County and the said Lee County embraced much of the same territory in each of the three old counties of Sumter, Darlington and Kershaw, the same territory embraced in both of said proposed new counties being not less than four-fifths of the entire territory that was embraced in each of the said counties of Salem and Lee. Maps of said Salem County and Lee County are herewith filed, and marked respectively, "Exhibit A" and "Exhibit B." About twenty-five square miles of territory in Kershaw County included in Salem County and omitted from Lee County is largely sandhills of little value and few inhabitants. And the election on the question of forming

Lee County was held within one year of the prior election on the question of forming Salem County.

10. That upon the establishment of the said Lee County, county officers for such new county, including clerk of court, sheriff, probate judge, treasurer, auditor, supervisor, commissioners of election and others, will be required; additional buildings, such as court house, jail and poor house, must be erected; terms of court must be held, and jurors therefor summoned and empanelled, books for registration transcribed, and an adjustment of indebtedness between the new county and the old counties made—all or some of which will involve an expenditure of money over and above what would be required if such new county be not established, and the money so expended must be raised by taxation of taxable property within the limits of said new county.

11. That the commissioners appointed by the said act of Assembly of 1898 are authorized and empowered to do acts and make contracts which will involve the expenditure of money, which, under the said act, would be a charge upon all of the taxable property of said Lee County, to wit; to have the boundaries of said new county marked as now surveyed, and to erect suitable buildings for court house and jail at the county seat.

12. That your petitioners are citizens, electors, freeholders and taxpayers of the territory embraced within the said Lee County, opposed to the creation of said county; and they submit, as matter of law, that as such opponents, they should make known their opposition, and take action to prevent the formation of such new county before the same has been fully established. And they further submit that the said act of the General Asesmbly is null and void, for the reason that the said Lee County did not receive the favorable vote of two-thirds of the qualified electors voting in each section of said proposed new counties, as reported by the managers of election, and as determined by the commissioners of election for the several old counties from which this new county was proposed to be taken; and for the fur-

ther reason that an election on the question of forming Lee County was held less than four years after the four-fifths of the territory embraced therein had voted upon the formation of a new county, as hereinabove set forth in section 2.

Wherefore your petitioners pray that the defendants, as commissioners of Lee County, may be enjoined from doing or performing any act or duty imposed upon them by the terms of said act of Assembly of 1898. And your petitioners, as in duty bound, will ever pray and so forth.

In response to the rule to show cause, the respondents appeared and demurred to the petition. After argument the Court handed down the following order on 13th May, 1898:

This was a petition, addressed to this Court in the exercise of its original jurisdiction, praying for an injunction to restrain the respondents from doing any act or performing any duty imposed upon them by the terms of an act entitled "An act to establish Lee County," approved 19th day of February, 1898, upon various grounds set forth in the petition. One of these allegations is that the proposition to establish Lee County did not receive the favorable vote of two-thirds of the qualified electors of the sections of the several counties proposed to be cut off for the purpose of forming said new county. To this petition the respondents have filed a demurrer, thereby admitting all the material allegations contained in the petition. The particular allegation above referred to having been thus admitted, it is manifest that the petitioners have stated a case which entitles them to the relief demanded, because it thus appears that one of the constitutional requirements necessary to authorize the formation of a new county has not been complied with. And if this be so, then the act purporting to establish Lee County is without constitutional authority, and hence the respondents have not been invested with any legal authority to do any of the acts or perform any of the duties provided for by said act; and hence the petitioners are entitled to an order of injunction restraining the respondents from doing the

act or performing the duties provided for in such act. Under this view it becomes unnecessary to consider the other point made, as to whether the former election to determine the question as to the establishment of Salem County forbids an election to determine whether Lee County, which is claimed to be substantially the same, in less than four years after the former election; and the Court is not to be understood as deciding anything either one way or the other as to that point.

As to what may be termed the formal objections to the petition, and as to the objection to the jurisdiction of this Court, it is sufficient now to say that we do not consider any of these objections as tenable. The reasons for these conclusions will hereafter be set forth in an opinion which will be subsequently prepared and filed.

It is, therefore, ordered, that the demurrer filed by respondents be overruled, with leave to answer over if they shall be so advised.

The respondents show for cause why the injunction prayed for in the petition should not be granted, and demur to the petition, and will move the Court at the hearing to dismiss the same, on the following grounds:

First. Of law, in that:

1. The case made by the petition is not properly cognizable by any court of justice.

2. This Court has no jurisdiction of the subject matter of the petition, in that: 1: That the subject matter thereof, submitted to the judgment of this Court, is purely political and a public matter. 2. That the petition seeks to enjoin the respondents, who are the mere agents of the legislature, appointed by it, in the exercise of its rightful power, to perform the duties by the act imposed.

3. That this Court is without jurisdiction of the case made by the petition.

4. That this Court is without jurisdiction to grant in this proceeding and in this mode, the injunction prayed for in the petition.

5. That the case made by the petition is not the subject of equitable cognizance, and if the subject matter of the petition be cognizable by this Court, yet the petition does not allege sufficient grounds for the equitable interference of the Court, in that: 1. It does not show that the petitioners have any such rights in the subject matter as entitle them to the injunction sought against the defendants. 2. It does not show that the petitioners have suffered or will suffer irreparable or other injury from the action of the defendants, in the discharge of their duties. 3. The only wrong it alleges to the petitioners is one not peculiar to the petitioners, but is common to all of the citizens of Lee County. 4. It seeks, in effect, to enjoin the collection of taxes.

6. That the facts stated in the petition do not state a cause of action, but to the contrary show that the respondents have no power to impose upon the petitioners the burden complained of.

7. That the facts stated in the petition do not warrant the granting of the injunction.

8. That the existence of all the matters of fact required by the Constitution of this State, as precedent to the creation and establishment of Lee County, has been *res judicata* since February 19th, 1898, on which day the governor of the State approved the act of the General Assembly of the State, entitled "An act to establish Lee County;" and these actions of the legislature and executive departments of the State are final and conclusive.

9. That there is a defect of parties in this proceeding, in this: 1. That the State of South Carolina is not made a party, either as petitioner or respondent. 2. That the counties of Lee, Sumter, Kershaw, and Darlington, respectively, are not made a party, either as petitioner or respondent.

10. That petitioners have a full, complete and adequate remedy at law.

Second. As matters of fact, the respondents show for cause why said injunction should not be granted, the fol-

lowing, which they ask should be considered by the Court, in the event that the cause shown as matter of law should be held so insufficient to prevent the granting of the injunction as to require further cause shown, viz:

I. That the statement as to the election, made in paragraphs 5 and 6 of the petition, is incomplete and incorrect; and respondents aver that not only in the Sumter and Kershaw sections, but also in the Darlington section of Lee County, more than two-thirds of the votes cast were cast in favor of the formation of Lee County; they admit that the election so prayed for as alleged in paragraph 5 of the petition was held, and the name proposed for the new county was Lee County, but they deny each and every other allegation contained in said paragraph of the petition; that they further deny the allegations of paragraph 6 of the petition, and say that in Darlington County there were only two voting precincts for said election, one at Cypress and one at Ashland; that the managers at Cypress duly held said election and duly delivered to the commissioners of election, the poll list, the boxes containing the ballots and a written statement of the result of the election at that precinct, showing that more than two-thirds of the votes there cast, were in favor of the formation of Lee County, and that the commissioners of election for Darlington County at their first meeting thereafter, canvassed the return of the managers of this precinct and declared the result of the election there in accordance with the said return. That the managers of election at Ashland precinct did not deliver to the commissioners of election the poll list, the box containing the ballots, or the written statement of the result of the election, as required by statute, nor did they return the vote there cast; but two days after the election, at Darlington Court House, not at Ashland, they prepared an illegal, unauthorized and incorrect paper, alleging it to be a statement of the vote cast at that precinct, and attached thereto an affidavit of one of the managers stating that a written statement of the result of the election had been put in the ballot box, and that the

box and contents were stolen on the night of the election; that upon such paper presented by the managers, the commissioners of election, at their subsequent meeting, declared the result of the election at Ashland to be against the formation of Lee County, notwithstanding that protest had been made against the making of such declaration, and notwithstanding the fact that more than two-thirds of the votes cast at Ashland precinct had been cast in favor of Lee County, which fact was fully proved before the General Assembly, and the truth of which these respondents here allege and aver. That at such second meeting the commissioners of election illegally declared the election at Cypress to be null and void; and never certified to the secretary of State the result of the election at such precinct, in tabulated statement of the vote cast thereat, as required by law, nor in any other form except that they sent up to the secretary of State the tabulated statement of the vote cast at that precinct made by the managers, a copy of which is herewith exhibited marked "B."

2. That no election upon the question of forming the same proposed new county, now Lee County, was held in four years before, or at any time before the election, upon the question of the formation of the county, now Lee County, and each and every allegation of the petition which is, or can be construed to be, the contrary of, or inconsistent with this allegation, is denied.

3. Answering paragraph 10 of the petition: They deny that any additional expense would be incurred by establishing a new county, and allege: That the land for the public building sites has been donated, and the town of Bishopville has agreed to erect the court house and jail at its own cost; and the buildings would have been in the course of erection had it not been generally rumored since the legislature adjourned, that some proceeding would be taken to enjoin the commissioners from carrying on said work. They deny that any extra tax would have to be levied upon the petitioners or upon any other citizen of Lee County, over and above

the present rate of taxation, for or on account of any expense incurred or burden imposed by reason of the formation of Lee County, but, in the opinion of the respondents, the taxes will be less than the rate now existing, for the reason that the area embraced in Lee County, is for the most part far away from the county seats of the respective counties of Darlington, Sumter, and Kershaw, and much nearer to Bishopville, the county seat of Lee County, and there will be a large amount saved annually in witness and jurors fees on account of the shorter distance to be traveled in attending court; and the salaries of the various officers in Lee County, are only about one-half of the sums paid to the officers of the three old counties named, and there will be a large saving to the taxpayers on that account.

4. Answering paragraph eleven of the petition the respondents say: That they have been directed by the act creating Lee County to mark out the boundaries of the new county, and to receive donations in lands, money and bonds, for the erection of a court house and jail, and have been directed to erect the said buildings, but they deny that any authority has been conferred upon them to create any debt, or to impose any burden upon Lee County, or upon any taxpayer therein.

5. Answering paragraph twelve of the petition: They admit that the petitioners are citizens, electors, freeholders and taxpayers in Lee County, opposed to its creation, but they deny each and every other allegation of said paragraph.

6. Further answering the petition, they say: That the territory embraced in the county of Lee is not the same as embraced in the county of Salem; that the following changes were made, viz: Fifty-three square miles of territory of Kershaw County, and twenty-three square miles of territory in Darlington County embraced in Salem County were left out of and are not embraced in Lee County; and fifty-five square miles of Sumter County not embraced in Salem, is embraced in Lee County; that the Kershaw territory left out, embraces farming lands of average quality and population; that the territory left out in Darlington County em-

braces a fine farming section, having within it the town of Lamar; and the territory taken in from Sumter County embraces a fine farming section and also has two villages (Magnolia and Lynchburg) within its area; and they submit in further relation thereto the affidavit of John H. Pate, and crave that the same may be read as a part hereof.

7. That all the allegations of the petition as to matters occurring prior to the passage of the act to establish Lee County were duly presented to the General Assembly by those opposed to the creation of this county, and full testimony taken and full argument of counsel heard in support of their force and effect; and it was after such presentation, evidence, and argument that the act to establish Lee County was enacted by the General Assembly upon full debate and consideration had.

8. That the petitioners with full notice at the time of all of the various steps being taken to establish and put in operation Lee County, and with full opportunity to test the validity of the same, have waited until this time to move in the matter, and, until after various citizens of Lee County and the adjoining counties from which it was formed, and other portions of the country, in consequence of full reliance upon the validity of the act, have entered into various contracts of the gravest consequence, both executory and executed, their interests under which would be afflicted by granting the injunction most seriously to their detriment, without fault or remissness on their part; and the respondents charge that such delay in seeking redress is such laches as bars the petitioners of the equitable relief sought.

9. The respondents charge that the petitioners have so participated by their votes, and the exercise of their influence against the formation of Lee County in the election on the question of the formation thereof, and the action following thereon, as to estop them from the equitable relief sought on the ground alleged.

10. That before this proceeding was instituted, the gov-

ernor, in the exercise of his executive authority and in pursuance of the act creating Lee County, had appointed three supervisors of registration for Lee County, and these supervisors had entered upon and had been for some time discharging their duty as such supervisors; that the citizens of said Lee County, recognizing its existence, and in the exercise of their political rights as such citizens, had assembled in public county convention, and elected delegates to the State political convention, to which these delegates were without objection admitted as equal representatives of the people; and that at least one of the auditors of the old counties from which Lee County was formed, had "made up a set of books for Lee County," as required by the act creating the county.

The petitioners demurred to the original return, but after the amended return was filed, by permission of the Court, this demurrer was withdrawn, and the following traverse filed:

And now come the petitioners aforesaid, by leave of the Court first had and obtained to traverse the amended return, for traverse thereof allege and say, that the injunction prayed for in their petition ought not to be refused by reason of any matters and things set up in the said amended return, because

1. These petitioners, reiterating the truth, completeness, and correctness of all the allegations contained in the 5th and 6th paragraphs of their petition, deny every allegation of the return inconsistent therewith, and specifically deny so much of the allegations of paragraph 1 of the return as alleges that "in the Darlington section of Lee County more than two-thirds of the votes cast were cast in favor of the formation of Lee County," and that "more than two-thirds of the votes cast at Ashland precinct had been cast in favor of the formation of Lee County." They admit the allegations of the return as to Cypress precinct, but allege that the commissioners of election for Darlington declared said election illegal for failure of the managers of election to re-

quire of the voters the production of a registration certificate and proof of their payment of poll tax due and payable six months next preceding said election, sending up, nevertheless, to the secretary of State the return of the managers of election at said precinct. They also admit that the managers of election of Ashland precinct (which was the only other voting precinct in Darlington County at said election) did not deliver to the commissioners of election the original poll list and other papers stated in the return, but allege that all such original papers were duly written and signed on the day of election and put into the custody of one of the managers (who was in favor of the formation of Lee County), and were never thereafter seen by the other two managers, nor by the commissioners of election for Lee County. These petitioners admit the allegations of the return as to the later and substituted return of the managers of election for Ashland precinct and of the action of the commissioners of election thereon, except the allegation that the substituted statement of the vote at Ashland precinct was an "illegal, unauthorized, and incorrect paper," averring as a further fact that the said commissioners considered and overruled the protest alleged in the return and transmitted to the secretary of State their statement, showing that a two-thirds affirmative vote was not cast at said precinct in this election. And these petitioners allege that the papers forwarded by the commissioners of election to the secretary of State fully showed that the aggregate vote of the only two election precincts in Darlington County was short of a two-thirds affirmative vote. They further admit that the General Assembly thereafter passed the act creating Lee County, after hearing affidavits pro and con as to the result of said election, and in disregard of the result reported to that body by the commissioners of election of Darlington County. But petitioners submit and aver that the General Assembly are not empowered under the Constitution of this State to create a new county upon ascertainment by them of the result of an election therefor on evidence by affidavit or otherwise than

by the submission to them of returns of the proper election boards, showing that two-thirds of the electors voting in each section of the proposed new county had voted in favor of such new county, and that, therefore, any inquiry and ascertainment by evidence other than the returns of the proper election board, is not proper in this proceeding.

2. These petitioners admit the allegations of paragraph 7 of the return, but allege that the "full testimony" therein referred to, was testimony by affidavits only, and they aver as they have hereinabove averred as to the powers of the General Assembly in such matters.

And all matters of traverse herein, these petitioners are ready to verify.

After full argument, the Court on 13th June, 1898, handed down the following order:

A difference of opinion having arisen amongst the Justices of this Court as to what issues of fact in this case shall be referred to the referee for his determination, and two of the said Justices having expressed a desire that all of the Circuit Judges shall be called to the assistance of this Court for the determination of that matter, in accordance with the provisions of section 12, of article V., of the Constitution of this State: It is ordered, that the Chief Justice, or in his absence the presiding Associate Justice, be authorized and requested to call to the assistance of the Supreme Court all of the Judges of the Circuit Court, to meet in the Supreme Court room at Columbia, on Tuesday, the second day of August next, at 10 o'clock A. M., for the purpose of hearing and determining the matter above stated. It is further ordered, that, for the purpose of preserving the *status quo* pending this litigation, the respondents be restrained and injoined from doing any of the acts or performing any of the duties required of or imposed upon them by the provisions of an act entitled "An act to establish Lee County," approved 19th of February, A. D. 1898, until otherwise ordered by this Court.

2—54

Previous to the assembling of the Court *en banc,* the respondents filed in the Supreme Court the following petition:

The humble petition of the respondents most respectfully showeth unto your Honors:

1. That they are informed by your Honors' order June 13, 1898, that a difference of opinion has arisen among your Honors as to what issues of fact in this cause shall be referred to the referee for his determination, of so decided and so serious a nature that all of the Judges of the Circuit Court have been called to the assistance of the Supreme Court for the purpose of hearing and determining the matter above stated.

2. That the petitioners in the cause, J. R. Segars *et al.,* have in their petition raised for adjudication two most grave questions of constitutional law, challenging the constitutionality of the "Act to establish Lee County," and have in their traverse sought to raise another yet graver question of constitutional law, challenging the constitutionality of the "Act to provide for the formation of new counties, and the changing of county lines and county seats, and consolidation of counties."

3. That what issues of fact should be so referred to the referee can, it is respectfully submitted, be best rightly determined, with full and proper advisement by the Court so constituted, only in the light of their conclusions upon these grave questions of constitutional law necessarily involved in and lying at the core of the cause.

4. Wherefore, and inasmuch as there has as yet been not only no order as to what issues of fact shall be referred to the referee, but no order that any issues shall be referred to him, or what shall be his duties, if he shall be appointed, and inasmuch as the decision of these constitutional questions is of the gravest moment not only to the parties and the county of Lee, but also to the commonwealth, the respondents pray your Honors, that the order of June 13, 1898, may be so enlarged as that the Judges of the Circuit Court may be called to the assistance of the Supreme Court for the

purpose of hearing and determining the entire cause, and that respondents be heard before the bar of your Honors in support of this petition, at such time as your Honors shall appoint, with like leave to the petitioners in the cause to be heard *pro* or *contra,* as they may be advised.

And the respondents shall ever pray.

The Court *en banc* assembled in the Supreme Court room on August 2, 1898 (all Justices present, and all Circuit Judges sitting except Judge Gage), and after full argument filed the following order on August 5, 1898:

The Circuit Judges having been called to the assistance of the Supreme Court for the purpose of determining what issues of fact, presented by the pleadings, should be referred to a referee for his determination, and having this day appeared in response to the call of the Chief Justice, the Court as thus constituted proceeded to the hearing of the matter thus referred to it. After hearing the argument of counsel and after full conference, the majority of the Court as thus constituted reached the conclusion that the only issues of fact which should be referred to the referee are the following, viz: Ist. Whether the board of commissioners of election for Darlington County certified the result of the election held in those portions of said county proposed to be cut off for the purpose of forming the proposed new county of Lee, under the order of his excellency the governor, in tabulated statement of the vote at each precinct, and transmitted the same to the secretary of State. 2d. If so, whether it appears from such statement that two-thirds of those voting at such election were in favor of the establishment of Lee County. The reasons for this conclusion will be stated in an opinion which will hereafter be prepared and filed.

On same day an additional order was filed, appointing James F. Rhame, Esq., referee to take the testimony on the issues indicated and to report his conclusions.

*Messrs. Boyd & Brown, E. K. Dargan,* and *Robt. W. Shand,* for petitioners.

*Messrs. Purdy & Reynolds, Leroy F. Youmans,* and *Thomas S. Moorman,* for respondents.

December 3, 1898. The opinion of the Court *en banc* was delivered by

MR. CHIEF JUSTICE MCIVER. This was a proceeding instituted in the Supreme Court in the exercise of its original jurisdiction, mainly for the purpose of testing the legality of the establishment of Lee County, formed from certain portions of territory cut off from the counties of Sumter, Kershaw, and Darlington. In the petition it is alleged, amongst other things, that while the result of the election, ordered by the governor, in those portions of Sumter and Kershaw counties cut off from said counties, and embraced within the area of the said new county, "was, as reported by the managers of elections within said areas, and as declared by the commissioners of election for said two old counties, favorable to the creation of said new county; but the result of said election in the county of Darlington, embraced within the area of said new county, was as returned by the managers of election, within said last named area, and as declared by the commissioners of election for said old Darlington County, unfavorable to the creation of said new county, in that, as reported and declared, it failed to obtain two-thirds of the qualified electors of said embraced area of Darlington County in favor of such new county." These allegations are made in the fifth paragraph of the petition, and in the twelfth paragraph it is again alleged that the proposition to establish Lee County "did not receive the favorable vote of two-thirds of the qualified electors voting in each section of said proposed new county, as reported by the managers of election, and as determined by the commissioners of election for the several old counties from which this new county was proposed to be taken." In the sixth para-

graph of the petition it is alleged : "That the result of said last mentioned election was certified, in legal form, by the commissioners of election for said three old counties to the secretary of State and by him was submitted to the General Assembly at its next session."

The respondents in their amended return say : "That the statement as to the election made in paragraphs 5 and 6 of the petition is incomplete and incorrect; and respondents aver that, not only in the Sumter and Kershaw sections, but also in the Darlington section of Lee County, more than two-thirds of the votes cast were cast in favor of the formation of Lee County; that they admit that the election so prayed for, as alleged in paragraph 5 of the petition, was held, and the name proposed for the new county was Lee County; but they deny each and every other allegation contained in said paragraph of the petition." And they then proceed to allege that in Darlington County there were only two precincts at which an election was held, to wit : "Cypress" and "Ashland;" that the managers at Cypress duly held said election and duly delivered to the commissioners of elections, the poll list, the box containing the ballots and a written statement of the result of the election at that precinct, showing that more than two-thirds of the votes there cast were in favor of the new county; and that the commissioners of election for Darlington County, at their first meeting thereafter, canvassed the return of the managers for that precinct and declared the result of the election there in accordance with said return; that the managers of election at Ashland precinct did not deliver to the commissioners of elections the poll list, the box containing the ballots or the written statement of the result of the election, as required by statute, nor did they return the vote there cast, but two days after the election, at Darlington Court House—not at Ashland—they prepared an illegal, unauthorized and incorrect paper, alleging it to be a statement of the vote cast at that precinct, and attached thereto an affidavit of the managers, stating that a written statement of

the result of the election had been put in the ballot box, and that the box and contents were stolen on the night of the election; that upon such paper presented by the managers, the commissioners of election, at their subsequent meeting, declared the result of the election at Ashland to be against the formation of Lee County, notwithstanding that protest had been made against the making of such declaration, and notwithstanding the fact that more than two-thirds of the votes cast at Ashland precinct had been cast in favor of the formation of Lee County, which fact was fully proved before the General Assembly, "and the truth of which these respondents here allege and aver." It is further alleged in the return of respondents that at the second meeting of the commissioners of election, they illegally declared the election at Cypress to be null and void, and never certified to the secretary of State the result of the election at such precinct in tabulated statement of the vote cast thereat, as required by law, nor in any other form. In that portion of the original return of respondents which has not been amended, they say, in answering the twelfth paragraph of the petition, that "They admit that the petitioners are citizens, electors, freeholders and taxpayers in Lee County, opposed to its creation, but they deny each and every other allegation of said paragraph."

After hearing the petition and return, as amended, and after full argument of counsel, it appearing that certain issues of fact were presented by the pleadings, which it was necessary should be referred to a referee to hear and determine, a question thereupon arose as to what issue or issues of fact should be referred to the referee, and there being a difference of opinion amongst the members of the Supreme Court as to that question, and two of the Justices of this Court having expressed a desire that all of the Circuit Judges should be called to the assistance of the Supreme Court, for the purpose of determining that question, in accordance with the provisions of section 12 of art. V. of the present Constitution, an order to that effect was accordingly

passed on the 8th of June, 1898, and in pursuance of that order the Circuit Judges have been called .in by the Chief Justice.

For a proper determination of the question thus presented to the Court, as at present constituted, it will be necessary to consider, briefly, what is the law with respect to the forma - tion of new counties .in this State. It seems that, prior to the adoption of the Constitution of 1868, there was no constitutional limitation upon the power of the General Assembly to provide for the formation of new counties. But by section 3 of art. II. of the Constitution of 1868, the General Assembly was specifically vested with the power to organize new counties, with these limita- tions, however, that "no new county shall hereafter be formed of less extent than 625 square miles, nor shall any existing counties be reduced to a less extent than 625 square miles." The present Constitution, in art. VII. places still further limitations upon the power of the General Assembly to establish new counties. The only one of these additional limitations necessary to be considered for the purpose of determining the question now before us, is that contained in section 2 of that article, whereby it is provided that "No section of the county proposed to be dismembered shall be thus cut off without consent by a two-thirds vote of those voting in such section." But the Constitution nowhere provides how the election for this purpose, which is required by section 1 of the same article, shall be held, or how its result should be ascertained, and hence that must be provided for by the General Assembly. Accordingly that body, at its first session after the adoption of the present Constitution passed "An Act to provide for the formation of new counties, and the changing of county lines and county seats, and consolidation of counties," approved 9th March, 1896—22 Stat., 64. That act, after providing in the first and second sections for the holding of an election to determine whether any proposed new county shall be established, proceeds in the third section to provide as follows: "For the purpose of

such election, the commissioners of election for each old county proposed to be cut shall appoint three managers for each voting place in the area of the old county proposed to be cut off, not more than two of whom shall be in favor of the proposed new county or against it, and shall deliver to them the books of registration for those voting places, which the registration officers shall turn over to the commissioners on demand. Such election shall be conducted in the same manner as general elections in this State, and all persons entitled to vote under the Constitution and laws of this State, at general elections, shall be entitled to vote at such election." The provisions of the fourth section of said act are as follows: "The commissioners of elections for each old county proposed to be cut shall canvass the returns of the managers of each precinct in their county at which such election has been held, as such returns in general elections in this State are canvassed, and shall certify the result thereof in tabulated statement of the vote at each precinct to the secretary of State, who shall transmit a tabulated statement of the vote at each precinct of an old county proposed to be cut off, to both branches of the General Assembly at its next session." Then follows the fifth section in these words: "The General Assembly at its next session shall create such new county, if two-thirds of the qualified electors voting at such election shall vote in favor of the establishment of such new county, and if all the constitutional requirements for the formation of new counties have been complied with, of all which such General Assembly must judge."

From this review of the legislation, both constitutional and statutory, it is apparent that one of the essential constitutional requirements for the formation of a new county is that: "No section of the county proposed to be dismembered shall be thus cut off without consent by a two-thirds vote of those voting in such section" (sec. 2, of art. VII). But as the Constitution makes no provision whereby it can be ascertained whether such consent has been manifested by a two-thirds vote of those vot-

ing in the section of an old county proposed to be cut off, in favor of the formation of the proposed new county, it was necessarily left for the General Assembly to make such provision. This has been done by sections 3 and 4 of the act above quoted, whereby it is substantially provided in section 3 that managers of election shall be appointed for each voting place in the area of the old county proposed to be cut off, by the commissioners of elections for such old county; that such election shall be conducted in the same manner as general elections in this State; and that all persons who, under the Constitution and laws of this State, are entitled to vote at general elections, shall be entitled to vote at such election. And in the fourth section it is further provided, sub- stantially, that the commissioners of election for each old county proposed to be dismembered shall canvass the returns of the managers of each precinct in their county where such election shall be held, as such returns in general elections are canvassed, and shall certify the result thereof in tabulated statement of the vote at each precinct to the secretary of State, who shall transmit a tabulated statement of the vote at each precinct of an old county proposed to be cut off, to both branches of the General Assembly at its next session. This, it seems to us, is the only mode prescribed by law, whereby the essential fact can be ascertained, to wit: whether two- thirds of the vote cast at such election in that portion of an old county which it is proposed to cut off for the purpose of forming a new county were cast in favor of the formation of such new county; and it is, therefore, the only mode by which that essential fact can be properly ascertained. Hence the only issues of fact necessary to be referred to the referee for his determination are whether the commissioners of elec- tions for the county of Darlington (no question having been raised as to the result of the election in the counties of Sum- ter and Kershaw) have certified the result of the election in tabulated statement of the vote at each precinct of said county at which such election has been held, to the secretary of State, and whether such tabulated statement has been

transmitted by him to the General Assembly at its session next following the election; and whether it does or does not appear from such tabulated statement that two-thirds of the votes cast in that portion of the county of Darlington proposed to be cut off for the purpose of forming the new county of Lee were in favor of the formation of such new county; for until this essential fact is ascertained in the only mode prescribed by law, the General Assembly would have no power to pass an act for the formation of Lee County.

It is contended, however, that by the terms of the fifth sec tion of the act above quoted the General Assembly has constituted itself the final judge of whether the necessary two-thirds vote was cast in the county of Darlington in favor of the formation of Lee County, and that by "An Act to establish Lee County," approved the 19th of February, 1898—22 Stat., 908—it has finally determined that question.

3 In the first place, it seems to us that the language used in sec. 5 of the act of 1896, above copied, is susceptible of two constructions—one of which would be in accordance with the provisions of the Constitution and the other would bring that section into direct conflict with the provisions of that instrument. In this state of things the rule is well settled that such a construction of an act should be adopted as would avoid any conflict with the Constitution, rather than a construction which would bring about a conflict with the Constitution. It may be that the General Assembly only intended, by the language used in that section, to declare that it should have the power to determine whether the result of the election had been ascertained *in the manner prescribed by law,* to wit: by the mode prescribed by the two preceding sections, 3 and 4, hereinabove copied, and this is the construction which must be adopted.

The construction contended for by the respondents is that, by the terms of the fifth section, the General Assembly has been invested with full power to determine finally whether this constitutional requirement as to the two-thirds vote as well as all the other constitutional requirements, have

been complied with.   If this be the proper construc-tion of the language used in sec. 5, then it is a mani fest attempt on the part of the General Assembly to assume and exercise judicial powers, which is plainly forbidden by the Constitution (sec. 14, art. I).   For it is alleged in paragraph 7 of the original return: "That all the allegations of the petition, as to the matters occurring prior to the passage of the act to establish Lee County, were duly presented to the General Assembly by those opposed to the creation of this county, and full testimony and full argument of counsel heard in support of their force and effect; and it was after such presentation, evidence and argument, that the act to establish Lee County was enacted by the General Assembly, upon full debate and consideration had."   That this was an exercise of judicial power on the part of the General Assembly is obvious, and it is equally obvious that it is in open violation of the section of the Constitution last cited, which reads as follows: "In the government of this State the legis-lative, executive and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other." Indeed, if the hearing and deciding a question as to the result of an election, upon evidence and argument, is not the exercise of judicial powers, it would be difficult to conceive what would constitute the exercise of such power.   It necessarily involves the hearing of evidence and the determination of questions both of fact and law arising out of such evidence.   We have no idea, therefore, that the General Assembly ever intended, by the terms of section 5 of the act of 1896, above referred to, to invest itself with judicial power; and if it did, then that section of the act is clearly unconsti-tutional, and, therefore, null and void.   That this was the view of the framers of the Constitution, is clearly shown by the fact that by sec. 11 of art. III. of the Constitution, it was thought necessary to invest the General Assembly in express terms with power to pass upon the election returns and

qualifications even of its own members, for that section provides as follows: "Each house shall judge of the election returns and qualifications of its own members." And again, by section 4 of art. IV., to confer upon the General Assembly the power to determine "contested elections for governor." In these two cases, and in these only, is the General Assembly invested with power to determine the result of any popular election; and they are not only *not* invested with any power to determine the result of any other popular election, but they are forbidden to assume or exercise such a power in any other case by the terms of sec. 14 of art. I., above quoted.

If it should be said that, under the views above presented, the board of commissioners of election would be invested with the power to determine *finally* the result of any election, such as that which is under consideration here, without any right of appeal to any other tribunal, and that the General Assembly could scarcely have intended any such result; to this several answers may be made. *First.* If the language used in sections 3 and 4 of the act of 1896 above quoted requires such a construction, then *ita lex scripta est* would be a complete and sufficient answer. *Second.* If, however, the langauge used in those sections is susceptible of the construction that the General Assembly intended to confer a right of appeal to the board of State canvassers, as in other elections, then the objection falls to the ground, as there was, in this case, no appeal to the board of State canvassers. While, for the reason just stated, it is not necessary now to *decide* whether the construction suggested is the proper one, it may be not amiss to say that there is much in the language used to warrant such a construction. By sec. 174 of the Rev. Stat. of 1893, the commissioners of election are declared to be the county board of canvassers, and by section 175 it is declared that such board of county canvassers "shall have the power, and it is hereby made their duty, as judicial officers, to decide all cases under protest or contest that may arise, subject to appeal to the board of State

canvassers." And in sec. 186, the board of State canvass-
ers, it is declared, "Shall have power, and it is made their
duty, as judicial officers, to decide all cases under protest or
contest that may come before them on appeal from the deci-
sions of the county board of canvassers;" and in several
cases it has been held that the decisions of the board of State
canvassers are final and not reviewable by appeal to this or
any other Court, and at most can only be reviewed under a
writ of certiorari, issued by this Court, for errors of law—
*Ex parte Riggs,* 52 S. C., 298. It is true, that the stat-
utory provisions just cited originally applied only to the elec-
tion of certain officers, therein specified; but by an act ap-
proved 2d March, 1896—22 Stat. 55—it is declared: "That
all laws now of force relating to the formation of county and
State boards of canvassers, and defining their powers, duties
and liabilities, * * * be and the same are hereby continued
of force, *and applicable to all elections* (italics ours) held
under the Constitution ratified on the 4th day of December,
1895, until repealed or amended by the General Assembly."
The election now under consideration being an election held
under the present Constitution, it seems clear that the pow-
ers and duties conferred upon the county boards of canvass-
ers and the State board of canvassers by those sections of
the Rev. Stat. which have been cited, are applicable to this
election. It seems to us that the words used in the third
section of the act of 1896, "Such election (that is, this elec-
tion,) shall be conducted in the same manner as general elec-
tions in this State," and the words used in the fourth sec-
tion of that act, requiring that the commissioners of election,
who, as we have seen, constitute the board of county can-
vassers, "shall canvass the returns of the managers of each
precinct in their county at which such election has been held
as such returns in general elections in this State are can-
vassed," may be construed as implying an intention on the
part of the General Assembly that an election of this kind
shall be conducted in all respects as general elections are con-
ducted, in which, as we have seen, the right of appeal from

the decision of the board of county canvassers to the State board of canvassers, is secured. See *Blake* v. *Walker,* 23 S. C., at page 525, where similar language has been construed.

But even if there is no right of appeal from the return made to the secretary of State by the commissioners of elections, it does not follow that there is no remedy for a grossly erroneous or perhaps fraudulent return of the commissioners of elections; and least of all it does not follow that this remedy is in the action of the General Assembly, by assuming and exercising a power which the Constitution, in express terms, prohibits it from exercising. It may be that the return of the commissioners of elections, if illegal or erroneous as matter of law, would be remedied on writ of certiorari, as in the case of *Ex parte Riggs, supra;* or it may be that if such return is alleged to be fraudulent, it might be set aside and declared void by an action for that purpose. But, however this may be, it seems to us clear that the General Assembly has no power either to set aside or disregard such return; and that until it is set aside or annulled in some form of proceeding recognized by law, it must be regarded as showing conclusively the result of the election.

For the foregoing reasons we cannot adopt the construction of sec. 5 of the act of 1896, contended for by the respondents, as such a construction would bring the act into direct conflict with the Constitution; and, on the contrary, we must adopt the construction of sec. 5 therein, above first suggested, as that will avoid any conflict between the act and the Constitution.

From this it follows that the only questions of fact necessary to be referred to a referee are (1) whether the board of commissioners of election for Darlington County certified the result of the election held in those portions of said county proposed to be cut off for the purpose of forming the proposed new county of Lee, under the order of his excellency, the governor, in tabulated statement of the vote at each pre-

cinct, and transmitted the same to the secretary of State; (2) if so, whether it appears from such statement that two-thirds of those voting at such election were in favor of the establishment of Lee County.

The judgment of this Court, as at present constituted, in accordance with the foregoing views, has heretofore been announced in a short order heretofore filed.

*Messrs. Justices Pope and Gary, and Judges James Ald-rich, Ernest Gary, J. C. Klugh, W. C. Benet, and R. C. Watts, concur.*

MR. JUSTICE JONES, *dissenting.* I am unable to concur in the opinion of the Chief Justice in this case. It is grounded on the proposition that the legislature must accept as final and conclusive the result of an election upon the question of creating a new county as certi-fied by the returns of the commissioners of elections. If, therefore, the result as returned by such commissioners is against the formation of Lee County, then the act establish-ing Lee County is absolutely void, no matter how incorrect, false or fraudulent such return may have been, and no mat-ter if in fact the requisite number of electors did really vote for the formation of such new county. The theory is that if such returns are incorrect, false or fraudulent, the deci-sion of the legislature thereon goes for naught, but an ap-peal might lie to the State board of canvassers, or certiorari might lie to correct mere error of law, or possibly an action might be sustained in the courts to set aside such returns for fraud; but until reversed according to law by some tribunal other than the legislature, the legislature must accept such returns as final and conclusive, and is powerless to determine for itself whether in fact the requisite number of legal voters voted in favor of the establishment of the new county. This view, it seems to me, is clearly erroneous. By article VII. of the Constitution, it is provided, among other things, that if two-thirds of the qual-

ified electors voting at an election upon the question of the formation of a new county shall vote "Yes" upon such question, then the General Assembly at the next session *shall* establish such new county. This article provides for other requisites for the formation of new counties not necessary to be mentioned here. It is manifest from this article of the Constitution that the legislature not only has the *power,* but it is its *duty* to ascertain for itself the existence of the conditions upon which it is required to establish a new county. The power to ascertain for itself the existence of conditions is necessarily implied from the power and duty to act when such conditions exist.

It is argued that it is a judicial function to ascertain the result of an election, and that, therefore, under sec. 14, art. 1, of the Constitution, which provides for the separation of the legislative, executive, and judicial powers of the government, and forbids any person exercising the functions of one of said departments to discharge the duties of any other, the legislature has no power to determine for itself the result of such election, that such determination would be an usurpation of judicial power. This argument, it will be readily seen, ignores the principle that the Constitution must be read as a whole. It may be granted that it is in some respects a judicial function to ascertain the result of an election, yet it does not follow that it is beyond legislative power to ascertain the true result of an election upon the formation of a new county, for the reason that the same Constitution which forbids encroachment by one department on the powers of another, also makes it the duty of the legislature to ascertain the existence of all conditions preliminary and requisite for the creation of a new county; because, as said, the power to create new counties on specified conditions, by implication, carries the power to ascertain for itself whether the necessary conditions exist. Therefore, you may call the exercise of such power a judicial function, it is nevertheless a *legislative* power under the Constitution. This is made very clear when considered in reference to other constitu-

tional conditions necessary for the formation of a new
county, whether the proposed new county contains the neces-
sary population, the necessary taxable property, the neces-
sary area, whether the proposed new county line runs within
eight miles of the court house of any old county, whether the
formation of the proposed new county would reduce any old
county to less than 500 square miles in area, or less than
2,000,000 taxable property, or less than 15,000 of popula-
tion.   Must not the legislature ascertain for itself whether
these conditions exist?   It can in ascertaining the facts use
its agents and committees, but as the creature is not superior
to its creator, no report of an agent or committee on these
facts is final and conclusive as to the legislature.   Why
should the report of commissioners of election in the matter
of the condition as to the requisite two-thirds vote be final
and conclusive?   It is conceded that it is essential to have a
special election to ascertain the existence of the requisite
vote, but the power to ascertain the *result* of the election ac-
cording to the *truth,* must still be in the legislature as a pre-
liminary to its action.   But it is argued that in the "Act to
provide for the formation of new counties, &c.," approved
March 9th, 1896, 22 Stat., 64—the legislature had mani-
fested an intent that the return of the commissioners of elec-
tions shall be final and conclusive.   It is extremely doubtful
whether the legislature could abrogate its duty to ascertain
for itself the existence of conditions preliminary to the for-
mation of new counties, but pass that by.   I contend that in
the act *supra,* the legislature clearly meant to reserve to itself
the ascertainment whether the requisite vote was had in the
steps to form a new county.   The requirement in section 3
that "such election shall be conducted in the same manner
as general elections in this State," may fairly be construed
as relating solely to the *manner* of conducting elections as
provided in sections 166 to 173 inclusive of the Revised Stat-
utes, such as the regulations for opening and closing the
polls, the administering of oaths, the keeping of poll lists.
the counting of the ballots by the managers, the statement of

3—54

the result and the delivery of the poll lists, the boxes contain-
ing the ballots and a written statement of the result to the
commissioners of election. So the language in the fourth
section requiring the commissioners of elections to canvass
the returns "as such returns in general elections are can-
vassed," can be fairly construed as relating to the manner of
canvassing and certifying the result to the secretary of State,
and not as conferring on the commissioners of election the
powers of the board of county canvassers in general elec-
tions. The exercise of the powers of the board of county
canvassers in general elections is subject to the right of ap-
peal to the board of State canvassers. But the legislature
expressly required the commissioners of election to certify
the result to the secretary of State, who in turn should trans-
mit to the General Assembly. This seems to eliminate the
board of State canvassers as a tribunal to which an appeal
might be taken from the commissioners of election, and it is
impossible, without express language to that effect, to con-
ceive that the legislature meant to confer upon the commis-
sioners of election such powers as contended for, without
having provided for an appeal, unless the legislature in-
tended to reserve for itself the right to ascertain the true
result of the election. It is not at all probable that the legis-
lature would make the commissioners of election of estab-
lished counties, who according to human nature and experi-
ence, would be expected to be opposed to the dismemberment
of these counties, the sole and final arbiters on the question
of dismemberment; but it is easy to understand why the leg-
islature would authorize such commissioners of election to
canvass the returns *in the manner* such returns are can-
vassed in general elections, with the provision that the re-
turns, or a statement thereof, be sent to the secretary of
State to be by him transmitted to the legislature, which by
the Constitution must decide for itself whether conditions
exist which are necessary for the formation of a new county.
No one would contend that the decision of a board of county
canvassers is final as to an election of governor or a member

of the General Assembly. Why? Because by the Consti-
tution contested elections for governor are to be determined
by the General Assembly, and because by the Constitution
each house shall judge of the election returns and qualifica-
tions of its own members. It follows that no one ought to
contend that the decision of the commissioners of election is
final and conclusive in the matter of an election for the for·
mation of a new county. Why? Because under the Con-
stitution it is the duty of the legislature to ascertain for itself
whether constitutional requirements for the creation of a
new county have been complied with, the power to create
upon conditions necessarily implying power and duty to as-
certain the existence of such conditions.

But further, the fifth section of said act of 1896 makes it
perfectly manifest that the legislature did not intend to
make the decision of· the commissioners of election final and
conclusive. It reads: "The General Assembly at its next
session shall create such new county, if two-thirds of the
qualified electors voting at such election shall vote in favor
of the establishment of such new county, and if all the con-
stitutional requirements for the formation of new counties
have been complied with, of all which such General Assem·
bly must judge." I will not lay stress on the fact, but I call
attention to it, that this section does not say that the General
Assembly shall create the new county, *if the result of the elec-
tion as returned by the commissioners of election,* is in favor
of the establishment, as it would have said naturally if such
had been the legislative intent; on the contrary, the new
county is to be created *if two-thirds of the qualified electors
voting at such election shall vote, &c.* But what I do wish
to emphasize is this language of the section, *"of all which
such General Assembly must judge."* This most distinctly
and positively affirms that the decision of the commissioners
of election is not final, and that the legislature will judge for
itself as to compliance with all constitutional requirements.
I confess my inability to see how this can be doubted. It is
said that to give this construction would place the act in

conflict with the Constitution, which if possible should be avoided. By the same reasoning ought we not to avoid a construction, the effect of which will inevitably result in declaring the act to establish Lee County void, if perchance the result of the election as returned by the commissioners of election is different from the result as declared in the act? But I do not think the fifth section conflicts with the Constitution. The legislature, as I construe the section, did not mean to make itself the *final* judge whether all constitutional requirements have been complied with, but meant to reserve its right of ascertaining for its own guidance whether constitutional requirements have been in fact complied with. The language certainly negatives the idea that the decision of the commissioners of election was intended to be final. I agree fully that the legislature is not the final judge of the existence of conditions essential under the Constitution for the creation of a new county. My view in this matter is that the legislature must in the first instance determine for itself whether constitutional requirements for the formation of new counties have been complied with, in order that it may exercise its power and discharge its duty in the premises; but when the act creating a new county is passed, it is within the power of the Courts to declare such act unconstitutional, if it clearly or beyond a reasonable doubt appears that some constitutional requirement has not in fact been complied with. The presumption is that the act of the legislature is valid and is consistent with the facts appertaining to the discharge of its duty and exercise of its power. On those who assail it rests the burden of showing clearly some constitutional vice. As against an act of the legislature deciding to the contrary, the return of commissioners of election in the matter of forming a new county is not final and conclusive.

If I am correct in these views, then the reference of issues in this case should go further than provided for in the order of the Court, so as to allow the parties to show the true state of facts, under the issues of fact raised in pleadings,

independent of the return of the commissioners of election, and independent of the action of the legislature thereon. But, in any event, the limitation of the reference to the mere ascertainment of the result of the election, as returned by the commissioners of elections, should not be based on the ground that such returns of the commissioners are final and conclusive.  Under my view, a reference merely to ascertain what was returned by said commissioners is of no avail, since such return in no way concluded the legislature on the question whether the requisite vote was had for the formation of Lee County.

*Judge D. A. Townsend concurs.*

JUDGE O. W. BUCHANAN, *dissenting.*  The Constitutional Convention of 1895, in article VII., provided for the formation of new counties, empowering the governor on the petition of one-third of the qualified electors within the area of each section of an old county, proposed to be cut off, to form a new county, setting forth the boundaries and show- ing compliance with the requirements of the article, taxable property, requisite population, that election had not therefor been held within four years last past, &c., to order an election in which the qualified electors of the proposed area shall vote upon the question.   Section 2 provides : "If two-thirds of the qualified electors voting at such election shall vote 'Yes' upon such questions, then the General Assembly at the next session shall establish such new county.   The General Assembly, at the next session (1896), for the purpose of carrying out this provision of the Constitution, passed "an act to provide for the formation of new counties," &c.   (Acts 1896, 22 Stat., p. 64.)   Section 5 of said act declares, after laying down the procedure : "The General Assembly at its next session shall create such new county, if two-thirds of the qualified electors voting at such election shall vote in favor of the establishment of such new county, and if all the established requirements of the

formation of new counties have been complied with, of all of which such General Assembly shall judge." Such a petition required by the Constitution was presented to the governor, who, being convinced of the truth of the matters therein contained, ordered an election in the territory set out in the petition. Immediately after the election there were charges of irregularities, of the theft of the box, &c. The returns (if they may be so termed) of two boxes, Ashland and Cypress, were counted against the formation of the new county, making the result in favor of the opposition to the new county. Those in favor of the formation of Lee County protested against such declaration, and satisfied the General Assembly that the requisite number of ballots had been cast in favor of the formation of the new county. Whereupon the act of 1898 (22 Stat., 908,) was passed in response to the constitutional requirement declaring: "That a new judicial and election county to be known as Lee County is hereby formed."

The petitioners claim that the act of 1898 was "null and void" (but no where alleged it was contrary to the Constitution), because it had declared that two-thirds of the qualified electors had voted for the establishment of the new county, which was not the fact, and because there had been an election in the same territory within four years last past. The traverse to the return does say that the General Assembly was not so empowered to pass upon the returns, but were bound to adopt the returns of the managers of the election, and prays for an injunction against the respondents who are commissioners for the new county. The purpose sought is to enjoin the carrying out of certain duties devolved by the statute upon certain officers who, it is alleged, are attempting to set up improperly, another political subdivision of the State, to be called Lee County. The main question to be considered refers to the establishment, formation and organization of Lee County. Was it properly and legally constituted? And as necessary to a full understanding of this matter, what is necessary to the estab-

lishment of a new county under the Constitution of 1895, and the acts of 1896 and 1898? Who is to determine when and how the new county is and has been established? Who is to determine when and how the requisite provisions have been complied with? Is it merely a question affecting the exercise of political powers, and, therefore, belonging to the legislative department, or is it a "judicial" question, requiring resort to the Courts for the determination of the effect of the evidence upon which the legislature sees fit to act, and necessitating the oversight and guardianship of the judiciary, as to the manner in which the General Assembly discharged its duty in the premises? Who is to say when the requirements of the law have been fulfilled? As incidental to the power of the legislature to organize new counties, does not there reside in that body the power to decide the conditions to be present upon which the power so to create new counties is to be exercised? If so, is this determination under the Constitution and laws upon the matter to be subject to the review of the judiciary, who may look into the record and in the face of the legislative determination that certain facts exist, decide that these facts do not exist? These are questions for grave and serious consideration. That a Court should be clothed with power to inquire into the evidence upon which the legislature acts, in passing an act, looking to the creation of a political division of the State, is a proposition most unusual; but that it should not only look into and weigh the evidence, but actually reverse the action of the legislative body upon a matter required by the Constitution to be passed upon by that body, is most startling. Whether a particular thing is required by the Constitution to be done, is a question of law, but whether the particular matter has been done and has been proven to exist involves a question of fact. Some facts must have been considered before the act could be passed. The passage of any such act necessarily implies that the evil to be remedied, or the right to be declared, was before the legislator's mind, and by him consid-

ered and determined. But does this determination neces-
sarily mean that this was a "judicial" determination, and ne-
cessarily trenching upon the domain of the judiciary? Cer-
tainly not. If this is not obnoxious to the Constitution in
the individual legislator, how can it be said to be obnoxious
to the Constitution, when it is made by all members collec-
tively with written evidence before them? Having the
right to decide upon and be convinced of certain election re-
sults, have they not the right to say what evidence shall con-
vince their minds? The Constitutional Convention and leg-
islature knew that the law of elections was never fully car-
ried out with technical nicety, and that it is the result—the
kernel and not the shell—the substance, not the form that
was to be valued, did not intend to put more value upon the
box or certain returns than the expression of opinion of the
voters whose ballots should be placed in the box. Having
required that the public expression shall be evidenced by
votes put into a certain box, and that then it should be re-
turned, if owing to its purposed destruction, should it be
said the legislature was deprived of the right to inquire into
the result in any other manner? If so, the destruction of
ballot boxes would be a serious obstacle to the formation of
new counties, and the will of the people would be over-
thrown. I think the right to decide the result of an election
necessarily implies the authority to effectuate the duty to
penetrate through all masks, subterfuges and pretenses, fraud
and chicane of all sorts—for as fraud is counterfeit, there is
no real obstacle. The trouble comes from a failure to dis-
tinguish between the exercise of a legitimate power and the
employment of necessary means for exercising that power.
The powers apportioned to one of the departments of gov-
ernment carried with it the right to use means appropriate to
the exercise of that power.

The Constitution, art. VII., sec, 1, provides for beginning
the machinery looking to a vote upon the subject of a new
county. It provides for the petition to the governor, "set-
ting forth the boundaries, and showing compliance with the

requirements of this article, the governor shall order an election within a reasonable time thereafter by the qualified electors within the proposed area, in which election they shall vote 'Yes' or 'No' upon the question of creating such new county, and at the same election the question of a name and a county seat for such county shall be submitted to the electors." Let us stop here and see what the governor is to do. He is to judge and determine whether the "requirements" of this article have been performed. What are the requirements of this article? (1) That one-third of the qualified electors within the area of each section of an old county proposed to be cut off has petitioned him for the creation of the new county. (2) That no election upon the question of forming the same proposed new county has been held within four years last past. (3) That the proposed new county to be formed will contain at least the 124th part of the whole number of the inhabitants of the State. That it will contain assessed taxable property of the value of $1,500,000, and area not less than 400 square miles (sec. 2). (4) That no old county will be reduced to less area than 500 square miles; (b) nor to less assessed taxable property than $2,000,000; (c) nor to the smaller population than 15,000 inhabitants; (5) nor that an old county will be cut within eight miles of its court house building. Logically and necessarily, he must determine whether those conditions have been complied with. He must be satisfied and must determine from the evidence before him that the area is properly surveyed, the inhabitants counted and the various requisites so mentioned have been complied with, that no election upon the question of formation of the same new county has been held within the last four years, &c. There is no appeal. If the Constitutional Convention intended to give an appeal to another body, it would have been very easy to have said so. This is the power given the executive, and it is given in the same instrument which says (art. I., sec. 14) : "the legislative, executive and judicial power of the government shall be forever separate and distinct from each other," so that the

necessary means for carrying into effect the general scheme for the organization of new counties as laid down in article VII. cannot be considered as trenching on the powers of the judiciary. The power given in article VII. not being in derogation of the independence of the three departments of government, the exercise of such power in whatever way the legislature may see fit cannot be in derogation of the judiciary—one of these departments. Nor can the judgment of the executive be controlled or regulated by another department, while following the powers laid down in sec. 1, art. VII., for the power given to one department is exclusive of and altogether free from the other branches of the government This view is illustrated by the line of authority which con- strues the powers of the executive to remove officers for certain derelictions of duty, in which it is held that "The grant of power to the executive to remove an officer for a certain cause implies authority to judge of the existence of that cause." "Here the law invested the governor with discretionary power which could alone be employed by him. The decisions of all the Courts of the State could not compel him to make the removal." *State ex rel. Attorney General* v *Doherty,* 13 Am. Rep., 132. See chapter 3 of "Executive Power," by Chambrun (translation by Mrs. Dahlgren, preface by Jas. A. Garfield, afterwards President); *Nobles* v. *Union &c. Railroad,* 147 U. S., 165; *New Orleans* v. *Paine,* 147 U. S., 261; Tenure of Office Decisions; *Grier* v. *Governor Taylor,* 4 McCord, *206. If this view be the one held where there is no special provisions pertaining to the subject in the Constitution, how much stronger must it be when the Constitution has declared that these powers shall be possessed by the governor and the legislature, notwithstanding the general rule of construction of the powers of the co-ordinate branches of the State government? The Constitutional Convention must be taken to have known the decisions as to the enforcement of election laws. Doubtless they knew that there had never been (and it was improbable, if not impossible, that there should ever be) a technical com-

pliance in any election with all provisions of the statute. Doubtless they were practical men, and knew that frequently the voice of the people was responsive, notwithstanding the fact that in some precinct or precincts the votes cast were not sent up.   Elections were never avoided for such a matter, where the wish of the people had been thus expressed and registered.   Having the power to determine what facts shall satisfy their minds, for convenience can they not appoint an agency whereby such facts may be the easier taken?   Having the power, have they not the right given them to exercise all those incidentals of power whereby its intelligent exercise may be promoted?   If that body has the power to procure information through a specially appointed commission, has it not a right to reserve its action and judgment upon the sufficiency of the matters reported to it?   No attempt is made here to deny the right of the judiciary to declare an act unconstitutional for non-conformity to the constitutional requirements.   To do this is one thing; to determine that the matters asserted by the General Assembly to have existed in order to the carrying out of their purpose and bringing into operation their power, constitutionally given, did not exist, is quite another thing.   To do the one, is wholesome and proper, and a necessary guarantee of a republican form of government with an equilibrium maintained—a protection of rights and property.   To do the other, is to reverse the lawfully expressed opinion of the people through the only channel provided for such expression.   The significance of the right to interfere and weigh the evidence that may have been before the legislature, the existence of which started the exercise of its function, cannot be exaggerated, when it is remembered that the right to give judgment upon this feature, necessarily carries with it and logically presumes the power to carry the judgment into effect.   Execution differs from judgment not in the quality of its power but only in the time and manner of its employment.   The power given for convenience to a commission or tribunal (by whatever name called) to gather the evidence

is that of the legislature itself, and does not differ in kind
from the exercise in open house of legislative functions.
To fetter the one is to fetter the other; to dam up its powers
anywhere is to deny its right to proceed everywhere. There
is no difference in principle from enjoining the house com-
mittee on elections and a special committee or tribunal to
take testimony for legislative action; nor is there any more
jurisdiction to inquire into the duties of one than into the
duties of the other, and no difference in principle from en-
joining the benefit of such legislation than enjoining the
General Assembly itself. The respondents represent but the
fruit of the tree.

In the beginning let me call attention to the fact that this
is an attempt by injunction to decide through the Courts that
the election held for the formation of the political division,
known or to be known as Lee County, was not carried by the
popular vote in the face of the declaration of the General As-
sembly that it was so carried by the adherents of that
county, and in the face of the authoritative declara-
tion by the representative branch of the sovereign
people of South Carolina, "That a new judicial and election
county, to be known as Lee County, is hereby formed"—not
that Lee County is to be formed upon compliance with cer-
tain conditions, but that Lee County "is formed"—having
complied with the conditions required. So the writ of in-
junction is sought to be used, not to prevent the doing of
some improper act merely, but to undo, tear up and throw
aside something already done—that the process of injunc-
tion is sought to restore the status existing before the act of
1898 was passed. Surely this use of the writ of injunction
is novel enough. But a still more impressive and novel
feature is the allegation of rights alleged to be in danger by
the threatened admission of Lee County into county-hood.
Driven to the last analysis, it means that the organization of
the new county somehow or somewhere will injure the pe-
titioners. There is nothing specific as to how or why they
should suffer more than others who will be placed in a new

county.    The gross want of equity is so flagrant in the relief,
sought that the artificial statement of the alleged apprehen-
sion takes the shape of saying that the formation of the new
county with its incidental requirements and accessories will
necessarily injure them; in other words, the formation of a
new county will necessarily injure all persons in the territory
covered by it—a proposition not borne out by facts—a prop-
osition the members of the Constitutional Convention of
1895 emphatically denied, when they indicated the public
policy of smaller counties—a proposition we are expected
to assent to if we decide the petitioners have any injury to
complain of.    If we are prepared to say that the formation
of a new county, *per se,* works an injury to private prop-
erty, then possibly they may have a standing in court.    But
who gives the Court the right?    By what power are we au-
thorized to inquire into the decision and judgment of the
Constitutional Convention, and in one act to override both
that Convention and the General Assembly of the State of
South Carolina?    Courts are to enforce the law unless they
are plainly opposed to the Constitution—not to suggest an-
other and different policy for the State.    I am not prepared
to say that the formation of a new county, *per se,* works an
injury.    I am not prepared to say the petition shows any in-
jury to the private and property rights of the citizen.    I
think it affirmatively shows that such a right does not exist.
See *Alexander* v. *McKenzie,* 2 S. C., 81.    Another most
important matter to be noticed is that there was no similar-
ity between the power of the election officers in the election
upon the formation of Lee County, and the powers wholly
exercised by the board of canvassers under the general elec-
tion laws.    In the former case, while there is some general
language employed indicating a purpose that such elections
"shall be conducted in the same manner as general elections
in this State," it specifically reserves the power and discre-
tion of judging if all the requirements for the formation of
new counties "have been complied with, of all of which such
General Assembly must judge."    They evidently did not in-

tend to be made to affirm the doubtful action of the officers
who held the elections. Doubtless, as practical men, they
realized the influence of the environments of the men who
might be appointed to hold elections under that act. In
many cases local interest would be overpowering. They
said that such local officers should not be the ultimate judges
of the ballots, and for that reason made a rule different from
the one which prevailed in general elections. Therefore,
there is no analogy to be drawn from the decisions appli-
cable to boards of canvassers or commissioners of elections
and the procedure here. It is very different. Here is an
attempt to regulate the discretion and inquire into the judg-
ment of the legislature in a case where a violation of the
State Constitution is not charged. True, the traverse of
the return does undertake to restate and extend the
charge of alleged nullity of the act of 1898, but even the
traverse, if allowed to have any weight as a new assignment,
would not make the charge free from ambiguity, as it
should be made in a matter of such gravity. The petition
and returns are the pleadings. The office of a traverse is
not to set up or amend the petition; it is based upon the va-
lidity of the matters set up in the petition, and its denial of
contrary or antagonistic allegations of excuse, evidence or
justification set up in the return. The traverse means a de-
nial, not a new assignment or recital of the matters com-
plained of in the petition. Matters of second thought and
independent allegations—allegations necessary to make out
a case or complaint, cannot make its appearance for the first
time in a traverse. The plaintiff must stand or fall on what
he states in his complaint or petition—remembering that
the charge made in the petition is substantially that the de-
cision of the legislature was contrary to the weight of the
evidence, the ineffectiveness of the attack is seen and recog-
nized. We are to review the conclusion of the legislature
upon the question of fact, not of law. The legislature did
not act independently of the constitutional requirements,
but said the constitutional requirements had been fulfilled

They recognized (and did not deny) that the constitutional requirements must be enforced. The act said so—there can not be any dispute about this. The objection here made is that they erred in a question of fact—*i. e.,* that the evidence showed that the constitutional requirements of two-thirds of the ballots had not been complied with, not that it was unnecessary to obtain the two-thirds, but that the evidence showed the two-thirds had been obtained. The error, if one, surely is not one of jurisdiction but of judgment—for every one must admit the legislature has the right and authority to provide for the formation of new counties— indeed, they are required to do it; they have a right to say when the agitation and formation has evolved into a full and complete new county. Bear in mind, then, this is not an attempt to show the legislature had no power to declare a new county formed, but an attempt to show that the legislature has no power to decide other than as the weight of evidence preponderates, and then it may be questioned in the Courts by showing the evidence was the other way. Stripped of all attempt to confuse this question of fact with a question of law, and plausible phraseology, the charge is that the legislature erred in weighing the evidence. It is charged that this is a question of law. The legislature must be satisfied by the evidence from the quantity and quality, that the election was carried, and that inasmuch as some boxes were stolen and the returns were not in their integrity produced before that body, it necessarily could not and did not have before it evidence on which to act. Can a judicial tribunal review a question of fact and see if the discretion of the legislature was properly exercised? Not in our form of government. The legislature says the evidence before them shows a complete compliance with the constitutional requirements. Are we to say that this statement was not true? Are we not to presume that everything necessary to form such a conclusion was before them? Are we not to presume the absence of evidence in order to nullify the act? The legislature by the act of 1898 has provided for

the election of representatives. The governor by his signa-
ture has recognized the existence of the new county. We
are told that the representatives of one of the great parties in
the new county has elected delegates to a political conven-
tion; elections have been held or nominations made to the
various offices; the people are going ahead, evidently basing
their faith on the act of the legislature, which disclosed (not
that Lee County should be formed in the future), but that
"Lee County is hereby formed." They had a right to pre-
sume the act was a constitutional exercise of the power
vested in the legislature—they have acted on it. There are
at least two ways of bringing up the constitutionality of this
act, and if it had been passed in violation of the Constitu-
tion, it could be shown without an appeal to the process of
injunction. Quo warranto would be the common law pro·
cedure. This is the plan most usually used—*People* v.
*Morrell,* 21 Wend., 563—except in States where a peculiar
extension of equity jurisprudence permits them to use in-
junction, as in *Bradley* v. *Commissioners,* 2 Humph., 428;
but even there the Court said: "That the writ of quo war-
ranto is the common law mode of redressing such griev-
ances is admitted." An action in the nature of quo war-
ranto is the proper remedy in this State—*Alexander* v.
*McKenzie,* 2 S. C., 81. In *Rumsey* v. *The People* (19 N.
Y., 41), the question was made as to the venue necessary to
be proved in a criminal case, while in *Lanning* v. *Carpenter*
(20 N. Y., 448), it was brought up in an attempt to show
that the confession of judgment was not made before a
county clerk, as there was no such county. In *Smith* v. *The
People,* 47 N. Y., 330, the question of irregular organiza-
tion of the city and county of New York was brought up in a
criminal case in an objection to the organization and juris-
diction of the Court; while in *The People* v. *Morrell,* 21
Wend., 563, an information in the nature of quo warranto
was the procedure. These are remedies at law—and all
question the creation of a new county. There was, there-
fore, no necessity to resort to equity; if there had been an·

injury to be redressed or a right to be protected—there was an adequate remedy at law.

I have adverted to the hardship that the declaring unconstitutional the act of 1898 would do to the people who now fondly suppose they are organized into a new county. This hardship and embarrassment was met by the Court in *Rumsey* v. *The People,* 19 N. Y., 41, which said that the organization of a new county will not be declared invalid even where it was originally and perhaps unconstitutionally introduced, when the existence thereof has been recognized by the legislative power, and it has been so incorporated into the State system that it cannot be severed without seriously embarrassing the whole. Can it be truthfully said that the State is not interested in this matter, when the representation of the old counties is cut down in order that the new county shall send representatives in proportion to area and population, and the new county is then not allowed such representation for such territory and population? The State is without the influence and services of the representatives she is entitled to rely upon in the General Assembly, and the proposed territory has taxation without representation. A political organization being for the benefit of a community, as such community, exclusively, a private person has no property rights in it. This results from the fact that government exists for the common benefit, and its powers cannot be appropriated to the exclusive benefit of individuals except by violence destructive of its principles—*Alexander* v. *McKenzie,* 2 S. C., 90. The political power concerns so nearly the public policy of the State, that the exercise of that part of the statehood and sovereignty of the people, so peculiarly legislative, should not be interfered with unless the incompatibility be clear and unequivocal. It is a matter of serious importance. I am of the opinion that if the other rule is to be considered the law in the formation of new counties in South Carolina, none will ever be formed. It is scarcely possible to hold an election without some non-compliance with the technical requirements. The Consti-

tutional Convention and the legislature contemplated that the results of the election was the thing desired, not the rule of technical compliance, substantial compliance, a compliance showing the expression of opinion of the requisite number. They did not intend to have one rule by which to judge the results of a general election, and a stricter rule (an almost impossible one) in elections for new counties—a rule that any manager in hostile territory may defeat, and be allowed the benefit of the wrong done to the credit of the old county's territory.

The case is brought in the original jurisdiction of the Supreme Court. The Constitution of 1868 gave the Supreme Court the power to issue writs of injunction when "necessary to give it a general supervisory control c over all other Courts in the State." The Constitution of 1895 gives such Court the power to issue such writ as an "original and remedial" writ. The language is striking: "The Supreme Court shall have power to issue writs or orders of injunction, mandamus, quo warranto, prohibition, certiorari, habeas corpus, and other original and remedial writs"—art. V., sec. 4. The right is original—it is jurisdictional. It is considered as "original" and "remedial" with mandamus, quo warranto, prohibition, and habeas corpus. It is as "original" and "remedial" as and no more than habeas corpus, quo warranto, prohibition—which expression means to say that as a remedy it shall be applied at the instance of persons who apply for and in whose name the writs of habeas corpus, quo warranto, &c., run. The purpose was to give the Court power to issue the writ as a jurisdictional writ, as contra-distinguished from the ordinary writ of injunction in aid of jurisdiction otherwise acquired. The purpose could never have been to authorize that Court to take original jurisdiction in ordinary suits in equity by granting the common orders or writs of injunction. The extraordinary writ and the prerogative writ was the only original writ of injunction given the Supreme Court by this section. An original writ of the same character as the other writs men-

tioned as habeas corpus, quo warranto, &c.    The framers of
the Constitution could never have given the Supreme Court
original jurisdiction in the trial of equity cases where the
ordinary writ of injunction was to issue, or they would
never have given to the Circuit Courts—Courts of original
and general jurisdiction—the right to try all civil cases; to
be more accurate, "They shall have jurisdiction in all civil
cases"—art. V., sec. 15.    In the same section they are also
given "original jurisdiction, subject to appeal to the Su-
preme Court, to issue writs or orders of injunction, man-
damus, habeas corpus and such other writs as may be neces-
sary to carry their powers into full effect," then follows the
sentence above quoted, empowering the Court of Common
Pleas with jurisdiction in all civil cases.    Can it be thought
for one moment that a great part of the equity practice was
thus to be transferred to a court of appeal?    I cannot bring
myself to think so.    The quality and grade of the writ is de-
clared when it is associated with well known prerogative
writs which are (in like manner) as other "original and re-
medial"—*"Noscitur a sociis."*    I need not cite in addition
sec. 29, art. I., Constitution 1895, which declares that the
provisions of the present Constitution shall be construed to
be mandatory and not merely directory.    I think the pur-
pose of the Constitutional Convention was to give the Su-
preme Court power to issue this extraordinary writ in a pro-
ceeding which discloses some public right—involving some
right of the sovereign as contra-distinguished from matters
of private or individual concern, where the State must be
plaintiff upon the relation of the party aggrieved.    It should
be brought by or with the consent of the attorney general.
If not so brought, some showing should be made that appli-
cation was made to the attorney general, who refused to
permit the use of the name of the State, wherefore the peti-
tion is brought in the name of the petitioner—the writ is-
sued by the Court in the name of the State.    See *People* v.
*McClees,* 1 Am. and Eng. Dec. in Eq., p. 570, *et seq.*

I do not think the Supreme Court had any jurisdiction to

entertain this case, and I think this constitutional Court has the right to look into and consider the whole case. This Court is not bound by any decisions made heretofore in this cause. I have tried to show the Supreme Court has no right to issue the writ of injunction in controversies between citizens in an ordinary suit for injunction. I d have shown that such Court has not any supervisory jurisdiction as it formerly possessed under the Constitution of 1868. The Constitution of 1895 took away such supervisory or incidental power and gave it original jurisdiction. Its authority to issue the writ, therefore, is to be justified under the right of original jurisdiction. If it has not supervisory jurisdiction, nor is it confined to the exercise of the writ as a prerogative writ in aid of some public right, then there is but one other right under which it could claim to act—*i. e.,* as a court of equity hearing and determining matters in the first instance as a Circuit Court does by summons and complaint and answer. Summons and complaint must be served and jurisdiction thus obtained, twenty days are allowed the defendants to answer, &c I need not say that this Court is as much bound by the Code of Procedure as the other Courts are bound, and if the jurisdiction in this case is entertained under the theory that the Court can try cases between citizens in which injunction is asked, then the conclusion can not be avoided that such cases must be tried under the rules and proceedings applicable to courts which try such causes. The Code says that a summons and complaint are necessary to obtain jurisdiction, twenty days must be given to answer. This was not done in this case, and I do not find in the record any evidence of any waiver—indeed, if it were possible to waive the defect—I will refer to this again further on in this opinion. The right of Lee County to exist as a county, with the right of its people to participate by their representatives in the legislature, is sought to be put in issue. The question of the constitutionality, if in issue here at all, is in issue directly; as in that manner only can it be in issue here. In discussing

this phase of the case, it is well to announce at the start that I do not doubt the power and authority of the Court sitting here in equity to pass upon the constitutionality of an election, where such matter arises collaterally, if the Court has power to enjoin in a suit. The authorities are not entirely agreed upon this point, but I think the greater weight is in favor of such proposition. It must, however, be brought into the discussion collaterally as necessary to the settlement of the property rights, which is the main feature of the cause. The issue must not be a political or governmental or electoral right—equity does not consider such matters. To give the court of equity jurisdiction, the issue upon the constitutionality must be really collateral, not the main issue, and it must not be pretensive—it must not be nominally collateral merely, it must be really collateral. Can any one say that in fact and in deed a property right is really involved? I need hardly say that there is hardly a claim—certainly not a well founded claim—that any property right is here involved. The scarcely nominal assertion of the property right is hardly answered. The attempt is to put in issue directly the alleged unconstitutionality of the act whereby Lee County became a distinct territorial and electoral division of the State. As I will show further on, this question should not be considered, for the pleading upon which this question is sought to be predicated, and upon which pleading alone the jurisdiction of the Court is founded (if founded at all), doubtless framed to avoid the objection that the constitutionality of the act is the main issue, is so argumentative and indefinite as not to raise any question at all, unless the formation of a new county is, *per se,* injurious and harmful, and furnishes a ground for injunction—in fact, it would seem to appeal to the Court, if at all, upon the ground that such an act, *per se,* injures them, and gives the petitioners a right to the remedy. Divested of all useless phraseology, it is an attempt to directly (not indirectly or collaterally) bring in issue the constitutionality of the act for the formation of Lee County, and while the

pleading is vague, the object and purpose is not veiled or denied. If the Court accedes to the prayer of the petition, it will not only be an innovation in equity practice, but would be as harmful and disturbing to the political body as it would be new and discordant. I deny utterly the doctrine as inconsistent with the corelation that must exist in the three departments through which the people act. It is subversive of all government. The founders of constitutional government in America were apprehensive of the effect of the power and impulse of legislative action, and barriers were erected to confine this power to wholesome confines—such was the fear of the founders of the American system and a proper co-ordination and equilibrium enjoined. In our day the pendulum has swung back—it has gone to the other extremity, and the law of injunction in its exercise as now sometimes used shows danger. The United States Supreme Court had lately done much towards dissipating this excrescence upon the equity practice. The time-honored refusal of equity to interfere with political affairs has been sustained. The attempt to interfere with the franchise has been repelled in the United States Circuit Court of Appeals in a case that went from this State recently. This condition exists when we are asked to issue an injunction against the formation of a new county. I need not say that the right to make subdivisions of its territory involves an element of sovereignty; and in the absence of any constitutional regulation could be exercised at the will of the sovereign. It is a political question, pure and simple. It involves no question of property. It is solely political, territorial and electoral, and equity has nothing to do with such matters. Are the Courts thus to hold elections for the people, and at the instance of (if the legislature be right) a defeated minority, reverse the will of the people expressed at the polls? The question carries its own answer—this is not the office of a court of equity. If "power seeks its own increase," when wielded by a legislature, it should be remembered that the maxim is not inapplicable to mankind under

whatever form power exists. If the lower courts exceed their power, certiorari, prohibition, appeal and exceptions lay to the appeal court, and plain and adequate remedy is had for its errors and excesses; but if an error is made by the appeal courts, what shall be the remedy? For "where there is a wrong there must be a remedy." It is to be supposed that they do not commit errors? The different deliverances of the courts of last resort upon the same subject show us how frequently the courts of one State do not agree with that of another—all do not agree in their conclusions; some appeal courts must necessarily have erred—all can not be right. If the cause be based upon a right of property, an appeal to the Federal Courts under the provision guaranteeing taking of property by "due process" might in an appropriate case be invoked; but here, where there is no property right involved, these defeated parties are without remedy. This would be enjoyed were this Court sitting as a court of the first instance upon any cause, and yet there is no appeal here. It seems to be thought that the mere exercise by the legislature of what is called judicial powers stamps the particular act as an encroachment on the judicial department of government and bespeaks its invalidity—nothing is oftentimes further from the fact. The legislature has at all times exercised judicial powers, and will doubtless continue to do so. It has tried contests over election of its members, decided whether an officer ought to be removed, and has power to exercise the functions of a court of impeachment in proper cases—truly these are judicial acts. The fact that the Chief Justice here (or the senior Associate Justice in his absence or on his disqualification) must preside when the governor is impeached, does not make that department any the less a legislative department. It may with as much truth be said that the courts in making rules and regulations of courts are exercising the power of legislation. The legislature, in the one instance, does exercise judicial powers, and the courts in the other instance do exercise legislative power; but in neither in-

stance are such powers prohibited—for Courts must make
rules and the legislature must decide questions before any
act is passed.    There is no such magic or mystery in the use
of the word judicial as to indicate that its use in connection
with legislative action invalidates such action.    The ques-
tion should be, is the act such an exercise of judicial action
as is prohibited to it by the Constitution.    If it is, such
action is unconstitutional; if it is not such an exercise of
judgment, it is valid.    It is not that the act is judicial so
much as it is that it is such a judicial act as would make its
exercise  an  encroachment  upon  the  territory  given  the
judiciary department.    It is harmful only where it inter-
feres with the duties given the other departments.    In *Ex
Parte Lynch,* 16 S. C., 32, the Court says: "It is a delicate
thing to declare an act of the legislature unconstitutional
* * * Implied limitations of legislative power are only ad-
missible where the implication is necessary * * * The con-
stitutionality of a law must be presumed until the violation
of the Constitution is proved beyond all reasonable doubt,
and a reasonable doubt must be solved in favor of legislative
action and the act to be sustained."    In other words, to be in
doubt is to be convinced of its validity.    In *R. R. Co.* v.
*Gibbes,* 24 S. C., 68, Mr. Justice McGowan, in delivering
the opinion of the Court, said: "It is an axiom in American
jurisprudence that a statute is not to be pronounced void on
this ground unless the repugnancy to the Constitution be
clear and the conclusion that it  exists  inevitable.    Every
doubt is to be resolved in favor of the enactment.    The par-
ticular clause of the Constitution must be specified, and the
act admit of no reasonable construction in harmony with its
meaning.    The judicial function involving such results is
one of delicacy, and to be exercised always with caution."
The requirements for the returns of poll lists are directory—
*McBee* v. *Hoke,* 2 Spear., 144; *State* v. *Harmon,* Cheves,
265; *State* v. *Nerland,* 7 S. C., 241; *Trimmier* v. *Bomar,* 20
S. C., 354.    The statute contemplates there will be irreg-
ularities and omissions, for provision is made for contests

and protests in the general law of elections. The authorities say: "To meet the objection of irregularities which the grounds suppose, it may be observed that the end of popular elections is to discover which of the candidates has the greatest number of votes from among qualified voters. The polls are of necessity holden by many persons at different places, and such elections are of course subject to irregularities * * * It follows irresistibly that we are to construe the rules for the regulation of popular elections with a constant direction to that end, and not to be deterred by minute objections and mere irregularities of manner or form." Judge Richardson, speaking for the Court, in *State v. Harmon, C*heves, 269. Judge O'Neill, speaking for the Court of Appeals, in discussing the statutory requirements relating to the appointment and duties of coroners contained in II. Statute, 48, says: "The first observation to be made on those statutory provisions is that they are directory merely." In *Trimmier* v. *Bomar,* 20 S. C., 354, there had been an election upon a certain proposed county subscription to a railroad, and an injunction was sought to restrain the county commissioners from issuing the bonds. Judge Witherspoon, on the motion to show cause, among other things, said: "The sole question, therefore, is whether upon a technical irregularity, which itself is disputed and is not satisfactorily established, the will of the qualified voters of Spartanburg County upon the question of subscription to the railroad company shall be defeated. On this question I can have no doubt. The purpose of this election was to discover the will of the voters of the county in the premises. That has been conclusively shown, and it ought not to be defeated by minute objections, and mere irregularities of manner and form, even when well established," p. 356. The Supreme Court says that the principle applies to both classes of elections—*i. e.,* political and under taxing power, p. 362. In *State* v. *Nerland,* 7 S. C., 241, the ballot boxes, ballots, poll lists and statements of the managers of election had been destroyed. It was held that the county board of can-

vassers had authority to receive secondary evidence. There was a total destruction of the evidence of the election. Chief Justice Moses declared: "If a statute which concerns the public is to be so strictly construed as to give effect to the form of the proceedings by which the purpose of the legislature is to be attained at the sacrifice of the only object they proposed to accomplish by their enactment, it may well be said that the Court conceded greater consequence to the shadow than to the substance. The policy of the statute shall be respected by the courts and strictly enforced, if it can be conformably to law. In a government founded on the will of the people, their voice is not to be stifled by fraud, or their high behests frustrated by wrong and violence. If the purpose of the State, expressed in constitutional form, to provide a county seat through an election of qualified voters, is to be set at naught by the destruction of the ballots, those charged with the ascertainment of the result of such election must resort to secondary evidence to enable them to determine it." If the manner in which the popular will is determined be immaterial, the means through which that will is announced is certainly less material. Brightley's Election Cases, 126; see, also, Cool. Const. Limit., 761. The Constitutional Convention knew this was the law. They knew that the ascertainment of the result of the election was the real thing to be determined, and that the matters occurring subsequently to the election, the destruction of the ballot boxes, refusal to send up poll lists, &c., would not be allowed to defeat the will of the people voting. The legislature indicating that this was their intention, declared in the "Act to provide for the formation of new counties," &c. (Acts 1896, 22 Stat., p. 65), "Such elections shall be conducted in the same manner as general elections in this State." Under the laws as "general elections" have been held (and will doubtless continue to be held) where ballot boxes have been destroyed, poll lists lost, and irregularities otherwise committed, the legislature would see to it that no advantage would be allowed to those in favor of whom the

destruction or omission to conform to the law was made, and secondary evidence would be allowed to show the will of the people.    If the will of the people could be thwarted by any act of those interested in the retention of the old organization, it would be a reflection on the integrity and manhood of the legislature.    They passed upon the irregularities as to the Ashland and Cypress boxes, as was to be expected.    They said that in the respects complained of the grievances were well founded.    After coming to this conclusion they decided to act in such a way as to leave no doubt if the means there resorted to should be used in the future, what their action would be.    Here were two polls, where the requisite two-thirds had been legitimately obtained in favor of the new county, deliberately made to show a decision against it in one box by an unlawful return, and practically against it in the other by declaring the election at Cypress null and void.    Doubtless they reasoned these boxes were in the hands of the officers of the old county, who doubtless had their own reasons for the disappearance of the ballot boxes and irregularities charged.    It was doubtless taken to be a striking coincidence that the poll list, ballot boxes and ballots had been stolen, and therefore, there was a claim that the result there had been given against the proposed new county.    The protest against the declaration of the result of the Ashland box but emphasized the persuasive coincidence of the disappearance of the box, and the result claimed to be in opposition to the formation of Lee County. The declaration of the officers of election charged with the custody of the ballot boxes, poll lists and incidentals of election, were made in the face of the fact that the legislature, by the fifth section of the act of 1896 (22 Stat., p. 65,) had reserved to themselves the right to pass upon the ultimate result of the election, when it said, "The General Assembly at its next session shall create such new county, if two-thirds of the qualified electors shall vote in favor of the establishment of such new county, and if all the constitutional requirements for the formation of new counties have been

complied with, *of all of which such General Assembly must judge."*    They heard evidence, they deliberated and passed the act of 1898 (an act to establish Lee County) (22 Stat., p. 908,) deciding that all requirements and conditions had been complied with, and appointing the respondents commissioners to have the boundaries of the new county set off and marked.    The act of 1896 provided for the formation of new counties thereafter, and said that at the next session of the General Assembly thereafter the new county shall be created.    The act of 1898 establishing Lee County was in response to the act of 1896.    If one is unconstitutional, then the other is also.    The one is the suggestion, the other the answer.    Both acts contemplate the same plan—to appoint a referee to inquire into the facts reported to the legislature, traversing their determination and consequently reversing their action, holding their action erroneous, must be based upon the alleged unconstitutionality of the acts of 1896 and 1898.    To appoint a referee to report what was returned by the officers at Ashland and Cypress boxes may be to decide the political question adversely to the determination of the legislature upon evidence before that body.    There is no question as to what the referee under such an order would have to report.    The officers holding the election at these precincts declared the result of such election to be against the formation of the new county.    The determination of the legislature was that the returns from these two precincts were not true, that the election as to the new county was in favor of its establishment.    This Court practically says that the legislature was mistaken; this Court cannot prevent the formation of Lee County, nor will its action in enjoining the respondents prevent the exercise of the rights of the people of the county, since the respondents are not charged with the organization of the county, but are commissioners for certain purposes—their duties arising from the fact that Lee County has been established.    The act of 1898 does not say that upon a return of certain commissioners the new county shall be established, but "That

a new judicial and election county to be known as Lee
County, is hereby formed"—section 1.　We have seen that
the Constitutional Convention, which provided for the inde-
pendence of the judicial, legislative and executive depart-
ments of government, in the same instrument providing for
the formation of new counties, saying, "If two-thirds of the
qualified electors voting at such election shall vote 'Yes'
upon such questions, then the General Assembly at the next
session shall establish such new county"—(art. VII., sec.
2) intended to give the legislature the power to decide the
means to be used in satisfying their judgment that "two-
thirds of the qualified electors voting at such election" did
vote in favor of the formation of the new county.　Having
to be convinced they had the right to say what amount and
quality of evidence should convince them.　They were
properly made the final arbiters upon this question of the
division of the State in the general policy of the State upon
such matters.　I do not see how the constitutionality is
properly in issue here.　It is true, in section 12 the petition-
ers do say, "And they further submit that the said act of the
General Assembly is null and void, for the reason that the
said Lee County did not receive a favorable vote of two-
thirds of the qualified electors voting in each section of said
proposed new county, as reported by the managers of elec-
tion and as determined by the commissioners of election for
the several old counties from which this new county was
proposed to be taken; and for the further reason that an elec-
tion on the formation of Lee County was held less than four
years after the four-fifths of the territory embraced therein
has voted upon the formation of a new county, as hereinbe-
fore set forth in section 2."　This last objection being so ex-
clusively and plainly within the province of the governor,
which cannot be controlled by process against him (*Grier* v.
*Governor Taylor,* 4 McC., 206), need not be considered.
Null and void?　For what reason?　Because obnoxious to
some provision of the Constitution?　No—not null and
void because unconstitutional, setting out plainly what sec-

tion it violates, but because its decision was against the evidence.   Who will have the hardihood to assert that such an allegation in the Court of Common Pleas would bring into issue the constitutionality of any act?   In fact, the Supreme Court has declared over and again that an exception charging that the decision of the lower Court was "contrary to the law and the evidence," was too vague, indefinite and general to be considered.   Void by reason of the unconstitutionality of the act of 1898?   The petition does not charge that.   Null and void for undertaking to pass upon the questions of election or no election?   No.   Null and void not because it undertook to pass upon such questions at all, but because the legislature decided in favor of the evidence of the new county having been established.   For that reason the act of 1898 was null and void.   Who can say the act is attacked as unconstitutional?   Where is "the particular clause of the Constitution" specified that must be obnoxious to "a reasonable construction in harmony with its meaning," as required by the decisions of the Supreme Court?   An allegation that the decision "was contrary to the law and evidence" has been too indefinite and general on appeal from the lower courts; the Supreme Court saying it stated no particular error.   *State* v. *Branham,* 13 S. C., 389.   "The constitutionality of a law must be presumed until the violation of the Constitution is proved beyond all reasonable doubt"— *Ex parte Lynch,* 16 S. C., 32.   It is impossible here to prove it, as there is no sufficient allegation, and the proof can go no higher than the allegations.   I need not say  what is known to every lawyer, that the Supreme Court has only the power given it by the Constitution, and the acts for its organization, and the means incident to the exercise of such powers.   As an appeal Court, it is confined to the matters brought up for its consideration by assignment of errors, as provided for appeals in the Constitution and Code, with the exceptions there laid down.   If it were to decide a cause not properly before it, or upon a point not properly raised by exception to it, there would be a taking of property or rights

of the loser without due process of law. As a Court of original jurisdiction it may issue "orders of injunction, mandamus, quo warranto, prohibition, certiorari, habeas corpus and other original and remedial writs." It must be taken that these powers are to be exercised by courts, and consistent with the provisions of the Code of Civil Procedure, where its provisions are applicable. Under the power to issue injunction, if jurisdiction were given it, it would have the power to issue a rule to show cause why an injunction should not issue, for the lesser is included in the greater, Supposing, for illustration, that such Court has the right to issue the writ in ordinary cases, I do not think it will have the power to issue an order of injunction in the absence of a suit for such a purpose. There must be a summons and complaint served on the defendants, for only in such manner can an action be commenced in this State. "Civil actions in the courts of record of this State shall be commenced by service of a summons." Code, sec. 148. "There shall be in this State but one form of action for the enforcement or protection of private rights and the redress of private wrongs." *Ib.,* sec. 89. The answer or demurrer required in twenty days as in cases before the common pleas. After such a beginning of the action a rule to show cause would be within the power of the Supreme Court, if it had power in the first instance, and in its discretion a preliminary order of injunction until the issues were tried. A perpetual injunction could not be ordered before the final hearing of the case on its merits. *Hornsby* v. *Burdell,* 9 S. C., 303. The matter of omission of summons being a matter pertaining to the jurisdiction of the Court, could be raised at any time. This requirement is based upon the view that the Supreme Court can entertain a suit for injunction between citizens. It is true, the notice from the Supreme Court may serve as the vehicle to bring this Court to its destination—to a consideration of the cause; but when the constitutional court arrives and enters, the members of that tribunal are entitled to traverse the whole domain—not confined to one nook or

corner in the territory of jurisdiction. If its members are bidden by the Constitution, when once they enter the gates, they are unrestrained save by the boundaries of the power that bids them—the Constitution. They are invited to traverse the whole field—the whole "cause or question," in all its width and length—by the Constitution, and they cannot be confined to such a part of this territory by the resolutions of the Justices of the Supreme Court, who are now required to sit as a part of the Constitutional Court. Did the framers of the Constitution mean to say that a part of the Constitutional Court should have more power and authority and jurisdiction than all of it put together? If such power had been given, the framers of the Constitution would have said so. If the Supreme Court had the power to call the Constitutional Court together to consider the whole cause, and instead of submitting the whole cause, suit or case, had indicated the submission of certain propositions growing out of the consideration of the case, upon the convening of the Justices and the Judges as the highest Court, the order could be rescinded or revoked and the whole cause considered. Every member of such Constitutional Court has the right, and it is made his duty by the Constitution to consider the whole "matter or cause"—and the cause must consist of all its parts, and whatever is necessary and incidental to a proper consideration of the whole case. If such highest Court have the right to begin the consideration of the case, it has the right and jurisdiction to complete and finish its consideration. If compelled by the Constitution to enter they are constrained to traverse the whole territory. If they begin such consideration they must end it. "It is as much the duty of a Court to exercise jurisdiction where it is conferred as not to usurp it where it is not conferred." It surely was not the intention of the members of the Constitutional Convention, that the convention of the Justices of the Supreme Court and Circuit Judges should be called together to consider some material or immaterial matter in connection with the constitutional questions that might be named by the

Justices of the Supreme Court, when the main or other part of the same matter should be reserved for them separate and distinct from the convention of Justices and Judges sitting in the higher Court. They were never authorized to cut off so much territory (so to speak), to consider and so much to set aside for the Circuit Judges to consider, for that is what the present practice amounts to. If so, the Constitutional Convention would have said so. This view is not only in accord with the spirit and reason of the Constitution, but harmonizes with its language. Art. V., sec. 12, reads (second sentence) : "Whenever upon the hearing of any cause or question before the Supreme Court, &c.," it shall appear that a constitutional question is involved. Again, in same section, "when any two of them desire it * * * on any cause or question so before the Court, &c."—thus referring to the cause or question before the Court—meaning the whole "cause or question" before the Supreme Court. So that if there was before the Court only a "question" under consideration equally with the consideration of "a cause," the Constitutional Court might be called together. The Constitutional Convention meant to use the word "question"—so as to cover all legal procedure that might not be covered by the use of the word "cause." Doubtless it was meant to cover every controversy (and all of it) which might develop or bring up a constitutional matter for determination—whether it came up by a regular action, special proceeding, motion or otherwise. The language is not to be construed to restrict the scope of the power, but to extend the field so as to embrace all involving construction that might be brought before it. The purpose was to place before all the Justices and all the Circuit Judges all questions of constitutional law, however (and just as) they may be raised in their fullness and completeness, whenever called upon. The experience of the Circuit Judges who are accustomed to determine matters at once as they are presented in their fulness, looking more to matter and substance and practice, was to be combined with the experience of the more deliberate, thorough

and matured consideration of the appellate Court. The Constitutional Convention contemplated that these matters should be considered by a convention of all the Judges, Supreme and Circuit, jointly—not a part of them by the Supreme Court and another part by the higher or Constitutional Court, separately—the consideration of all of them upon every part of the controversy touching the constitutional interpretation or application in the whole case, suit or proceeding. The call for the convention of the Justices and Judges, issued by the Supreme Court, designated only part of the cause referring to the Lee County controversy for the consideration of the Constitutional Court, and it may be said such matters only were considered by the majority of the Court. It seemed to be taken for granted that this Court was restricted to a consideration of the designated questions. Of course, a designation of these questions was necessarily a prohibition of the consideration of other questions not designated and submitted. The supposition, doubtless, was that the decision as to the constitutionality or unconstitutionality of the matters would turn upon the solution of the question of reference or no reference—into the matters of fact the legislature had before it at the time of its determination. If an example was wanted to show how impractical and useless the Court would be if the contrary contention were adopted, the present case would furnish it. Here the matter is made to turn upon a question, that (if our view be adopted) might be conceded, and yet the integrity of the legislation might remain unimpaired—for the acts upon the subject and the records of the case in the Supreme Court show that a reference is not only unnecessary to determine this matter, but that upon the consideration of the matter from the records and acts before the order of reference was signed, it must have been determined that the act was unconstitutional. Indeed, if it were determined that the act for the organization of Lee County was obnoxious to the Constitution, the power of the General Assembly to carry out the provisions of the Constitution

upon the subject remains unimpaired. Having the power, it had a choice of means to create or recognize its existence. Can it be said that a reference is needed to show what the officers charged with the holding of the election did? What does this amount to, when the General Assembly expressly and wisely reserved to themselves the authority to determine how the election was carried? While the elections are held after the manner in which general elections are held, yet unlike in cases of general elections the officers charged with holding this election were not clothed with any power to conclude any one by any determination they should declare, inasmuch as the act specially takes that power from them and reserves it to the legislature. They were not given such power as are ordinarily given to similar officers at general elections—there is no analogy. Their conclusions were not required nor expected. They could not determine how the election was carried, and their declarations were not subject to appeal from subordinate to county board of canvassers, nor could there be any analogy in the procedure of determining this question to the duties of county canvassers and county commissioners in general elections, for the act on this question reserves specially and expressly the decision to the General Assembly, as if to say this temptation should not be put before the officers who shall conduct this election, and their wisdom in this regard is now apparent. And now when two of these officers, in violation of their duties, make a declaration they had no right to make, as to the election, we are called upon to say there was imported into this cause this extraneous matter never contemplated, which has affected the election, because, forsooth, the legislature refused to adopt the usurpations of certain officers as to the result of the election, in the very teeth of their reservation of such matters for their own determination. Such reference could not throw any light upon the subject—a reference is not necessary, for which reason I voted against the order for reference. If, however, a reference is to be ordered, it should go into the whole matter and ascertain the

whole result, whether there has been a real and substantial
(not merely a technical) compliance—not merely to exam-
ine the matter from the outside—not merely to read the tab-
ulations and the papers made out, but to the contents—as
substantial results not forms are desired in elections. The
will of the voters is the matter desired; to this all else should
be secondary and unimportant.

The different acts provide for the diminution of the repre-
sentation of the old counties which have contributed terri-
tory to the new counties, by reason of which such represen-
tation is cut off. Such representation taken from the old
counties is given to Lee County. Now if the organization
of Lee County is unconstitutional and improper, the persons
elected from this territory to the General Assembly
have no lawful status, and the State will be deprived
of their services in the General Assembly. Now, no
provision can be made by the Courts for the restoration to
the old counties of the representation to which they were en-
titled before the passage of the act for the organization of Lee
County. It will scarcely be disputed that if there were no
Lee County, and those electors supposed to be voters of Lee
County were really voters of the old counties, the old coun-
ties were entitled to their votes; and if they did not partici-
pate in the election for members of the General Assembly, it
may become a grave question whether the persons recently
returned by them as members of the General Assembly were
indeed elected at all. If these gentlemen, so returned as
members elected from the old counties, were not indeed
elected by reason of the disorganization of Lee County, any
measure passed by their votes in the General Assembly
might properly be questioned—for if not elected they would
not have a right to sit and vote. If the territory proposed
to be organized into Lee County was improperly organized,
it can hardly be disputed that the election in the old counties
from which the territory was taken was invalid—and
there was no valid election in them for county officers as
well as members of General Assembly—if Lee County has

no existence, there may be grave doubts, if any officer, legislative or county, were elected in the old counties. It can scarcely be denied that the whole State has an interest in the services and votes of every member of the General Assmbly from every county; and yet the attorney general is not made a party to this proceeding. Each of the old counties is concerned as such in this proceeding, if this legislation be unconstitutional, and yet as such they are not made parties to this cause. Who represents all these citizens, who will be affected by this procedure? I need not allude to the disarrangement of the assessment and collection of taxes, &c., in the new territory. It might well be asked what necessity is there to inaugurate such demoralization? The mere unconstitutionality of a statute does not give a cause of action—there must be shown that an unconstitutional statute has inflicted some injury upon the petitioners. A court of equity never enjoins by reason of a theoretical or speculative injury. "Injunction will not lie at the instance of a taxpayer and elector to enjoin the submission to the vote of the people of a constitutional amendment because the submission is invalid, as such taxpayer would receive no substantial injury from such admission." *State* v. *Thorson,* 68 N. W. Rep., 202. "Any additional burden which might result to relator, as a taxpayer, by reason of submitting this question at a general election, is too trifling, fanciful and speculative for serious consideration" (*Ib.*) There must be a real injury, and the petition does not show any injury, unless, forsooth, the formation of a new county is, *per se,* an injury. This view the Constitution, by providing for the organization of new counties, negatives. Even, however, if the petitioners were injured, and the statute were unconstitutional, an injunction should not issue, for the additional reason (among others) that greater wrong would be done than prevented by the injunction, the remedy prayed for, than the evil apprehended. Under such circumstances, equity never issues the writ—10 Am. and Eng. Ency. Law, 783, and authorities there cited. The appre-

hended injury by reason of increased taxation, if charged properly, would probably not exceed for the handful of petitioners ten cents each. The harm that would be done by the writ can not be overestimated. The anticipated and speculative damage, probably not exceeding a dollar at the outside, is to be used as a pretext to create untold harm, turmoil and political demoralization in the State, to becloud the title of many officers elected at the last election, to deprive the State of the service of persons returned for the General Assembly, possibly throw a doubt over beneficial legislation, and to establish a precedent and innovation most mischievous and unnecessary. Indeed, if the principle contended for be carried to its logical conclusion, government as now known, consisting of three departments, may be dissolved. Once admit that an election for members of the General Assembly or the fruits of it can be enjoined, even under an unconstitutional statute, and you have no legislature—one branch of government destroys another. The right to enjoin the election or reverse its verdict in one county, implies the right to do it in all, if similar circumstances arise. He must be a bold man, indeed, who will contend that such an exercise of power could be justified under our system of government; and yet the finger could not be placed on any provision in the Constitution forbidding it. Nevertheless, such a contention would militate against the very existence of sovereignty itself, and would negative the right of a State to exist, deducible from existence itself. The right of a Sate to exist in this advanced age implies the right to be composed of three co-ordinate branches of government, with their checks and counterchecks. This Court has no authority to entertain a petition to thus destroy the government which protects the life, liberty and property of the petitioners. If the practical application of injunction in this case makes disaster, the historical view of its creation and exercise is equally conclusive of its inapplication here. The writ ran in the name of the sovereign in theory, issued and was exercised in his

name to prohibit the unlawful action.   It was a prerogative
writ—it is none the less a sovereign writ with us.   The
State (by its people) is sovereign with us—the sovereign is
asked to enjoin himself.   One member of the body is to
enjoin another member of the same body.   This statement
is urged against its use here.   The effect is not lessened
when it is recalled that in cases of impeachment·of the gov-
ernor, the Chief Justice himself presides in such legislative
trial and court.   I do not think the petitioners have shown
any injury, apprehended or real, that appeals to a court of
equity.   There can not be a vested right in any political
division of State organization.   There is not any vested
right in any particular political office.   ·Chancery protects
property (not political) rights—it is not to be invoked to
enjoin the formation or creation of a political agency and
subdivision of the State.   It is believed by many that a
new county works a real benefit instead of an injury to the
residents of the proposed territory—the framers of the Con-
stitution of 1895 evidently thought so.   The different sub-
divisions of the State serve as instrumentalities of the State
for the State, for the more convenient administration of
public affairs, and form a constituent part of the State, and
a part of the governmental machinery of the sovereignty
which creates them.   When the General Assembly formed
Lee County, and said it should have certain representation
in the General Assembly, and should unite in the exercise of
the rights of sovereignty representing the sovereign people
of South Carolina, it exercised a political right and sover-
eign duty that could not be affected by any Court.   It was
the highest expression of a sovereign people as to what
would the better effectuate that sovereignty—can it be
imagined that the Constitutional Convention intended to
trim off and pave down this sovereign right and obligation
to carry out a public policy?   The right to create an agency
of government does not exist for the benefit of an individ-
ual, but for the benefit of the State itself.   It is a doctrine
too well known to need more than passing reference, that an

injunction does not lie against the executive to restrain him from executing an unconstitutional act of the legislature (*Georgia* v. *Stanton,* 6 Wall. (U. S.) 50; *Green* v. *Mills,* 69 Fed. Rep., 852); nor will it interfere with the exercise of a purely legislative or executive power. See cases cited in *State* v. *Thorson,* 68 N. W. Reporter, 202. These doctrines were not adopted without reason, and the principles underlying them are founded on the sovereignty of the people, and the necessity or organization to exercise the formations of government, based upon the three great departments of political existence, that the people may always have a channel through which to express their sovereignty. Each branch of government is necessary to constitute a State, as a State is now constituted—each is necessary to government in the practical exercise of sovereignty—in fact, it may be said in these days that sovereignty with or without a written charter implies the existence of these powers. If the contention of the plaintiffs be carried to its logical conclusion, and the real nature of this proceeding be considered, the principle sought to be injected into our law will sap, undermine and overturn the government, and destroy all the guarantees of a republican form of government; for if an injunction will lie to practically oust the delegation of one county from the halls of the legislature, under an alleged unconstitutional law, it would lie against the delegations of all the counties of the State that might be elected under an alleged unconstitutional act—it would scarcely be a question that the judiciary could not thus nullify the Constitution and rob the State of an attribute of sovereignty. Without a legislature, and the exercise of its power to appropriate funds for the defraying of expenses of government, election of officers, &c., anarchy and chaos would pervade society—there would not be a republican form of government. It will be no answer to this to say this condition is not permissible, and that the creatures of the legislature will be enjoined, not the members as members. Let us not be diverted by this position—let us look

not alone at the application to this case of this doctrine; let
us consider it in its length and strength or not consider it at
all.    We should stop the stream at its head now, rather than
wait until it has grown larger, wider, and within a deep-
ened channel and greater volume threatens an overflow,
drowning government.    Such a doctrine is utterly at vari-
ance with the views expressed in the impeachment trial of
President Johnison—held by Jackson, Jefferson and the
great framers of our government, and deducible from the
principles of government and the exercise of sovereignty.

In 1827, there was an election for sheriff of Georgetown,
and there were two competitors, Grier and Thaxton, and
Thaxton was declared elected by the managers.    A motion
for prohibition was made before Judge Bay, and among
other things he said: "In our country, the people are su-
preme.    All civil power and authority is derived from
them; and by virtue of their inherent prerogatives, they
have thought proper, in order to establish justice and to pre-
vent all irregularity and confusion, to make known and
publish to the world their great republican charter, called
a Constitution, by which all the powers of the State are reg-
ulated and governed.    By this Constitution, all the powers
of the government are distinctly defined and vested in their
separate branches, namely, the legislative, the judicial, and
the executive, all of which are independent of and have no
control over each other.    The legislative branch has the
power of making and enacting all laws for the government
of the citizens; the judicial has the power of construing
those laws so made, and of declaring their bearings on the
citizens; and the executive is charged with the authority and
power of causing all those laws to be duly executed, and of
granting commissions to all the officers of government for
the exercise of their respective functions in office, for the
benefit of the whole.    But no one of these different depart-
ments has any right to interfere with the others in the legal
execution of their official duties.    It is admitted that the
Judges of the superior courts of law, in the exercise of their

judicial powers, have a right by the common law of the land, which is recognized by the Constitution, to send out this high prerogative writ to restrain all the inferior courts and jurisdiction or bodies of men appointed for special purposes, from doing illegal or unauthorized acts. But they have no power or authority to send out a writ to either of the other great branches of the government; for, if they had such a power to invade the province of the executive, and to say he shall not exercise his official right of issuing commissions, &c., it is difficult to see any good reason why they should not send the same writ to the other great branch of the government, to restrain it from passing any law which they might conceive was an impolitic or unconstitutional act. Thus a doctrine would be laying the foundation for a scene of confusion and clashing of jurisdiction." *Grier* v. *Taylor,* 4 McC., *206. Is there not application now for this decision? What has equity here to work upon? It must be moved by some property right—I repeat, there is not set out in the petition here a right that equity protects. That equity does not protect political rights, is a doctrine so fundamental and ingrained into our system of government, that authority is not needed to support it. See *Green* v. *Briggs,* 16 C. C. A., 516. High on Inj., secs. 702, 1311, 1315, 1206. Indeed, the authorities go so far as to say, if an attempt were made to interfere with such right, the refusal to obey such an injunction would not constitute a contempt. High on Inj., 1286, 1312, 1314. How is it possible for the petitioners to be injured in their private rights, passes all understanding, unless the establishment of a new county is, *per se, in*jurious. The party seeking relief must show clear legal or equitable right, and a well grounded apprehension of immediate injury, in order to justify the granting of an injunction. The injury must also be irreparable—not to be repaired by money. If adequate reparation could be made, then he should resort to the law side of the Court—mere apprehension and fears of the plaintiffs, unsustained by facts establishing their probability, will not

constitute a sufficient ground to warrant interference by injunction.    High on Inj., 35, 722; 10 Am. & Eng. Ency. Law, 783, *et seq.*    The statement of facts should be so strong, as if made by a plaintiff on the witness stand would justify (if uncontradicted) a judgment for him.    I do not think the matter set up in the petition states facts enough. In addition to the ordinary strictness in this character of cases, the petitioners should set out that they did not vote for the creation of the new county but against its formation, and exhausted all their efforts in vain.    It is true, that the issuing of the writ is within the discretion of the Court—not to be exercised by a capricious judgment based upon imaginary injury and ambiguous and indefinite allegations, speaking by conclusions and not averments, but a judicial discretion—a discretion controlled by precedent and authority.    Such discretion, based upon such a consideration of the allegations of the petition, which nowhere make such an attack upon the act of 1898 (or other act) calling for a decision upon its constitutionality, in my judgment, would refuse the writ.    It is a matter of grave consideration to declare an act unconstitutional, and the allegations of the pleading should plainly make such an attack.    I repeat, that such an attack is not made by the allegations of the petition here— it but vaguely charges that the act is null and void, because the statement of fact in the act was contrary to the evidence.    An allegation that heretofore coming on appeal from the humblest court has uniformly been construed as not worthy of consideration.    It is an allegation that does not move the Court to consider the matter.    The plaintiffs do not attack by their petition the constitutionality of the act—such a statement as required nowhere appears.    If, under the constitutional administration of justice in this country, the Courts are given the power of supervision over corporations formerly claimed by the King in his Courts, it must still be exercised (unless in exceptional cases, of trusts, charities, &c., not necessary here to be noticed), according to the course of the common law—Chancellor

Kent, in *Attorney General* v. *Utica Ins., Co.*, 2 Johns. Ch., 387, 388. The same great authority lays it down, that if the matter "does not touch the enjoyment of property, it ought not to be brought within the direct jurisdiction of the Court which was intended to deal only in matters of civil right resting in equity, or where the remedy at law was not sufficiently adequate. Nor ought the process of injunction to be applied but with the utmost caution. It is the strong arm of the Court, and to render its operation benign and useful, it must be exercised with great discretion and when necessity requires" (it), p. 378, 379. The learned Chancellor above, in speaking of the great case of *The King* v. *The Master and Fellows of St. Catharine's Hall*, 4 Tem. Rep., 233, said: "Lord Kenyon, in giving the opinion of 'the Court, said that corporate bodies which respected the public police of the county, and the administration of justice, were better regulated under the superintendence of the King's bench, &c." I will close this opinion with a statement which was uttered by Chancellor Kent, *Attorney General* v. *Utica Ins. Co.*, 2 Johns. Ch., 391, declaring "the process of injunction is too peremptory and powerful in its effects to be used in such a case as this without the clearest sanction. I shall better consult the stability and utility of the powers of this Court by not stretching them beyond the limits prescribed by the precedents."

On November 18, 1898, the referee filed his report, and after setting out in full the papers examined by him, and proceedings had before him, he arrives at the following conclusions:

That the board of commissioners of election for Darlington County did *not* certify the result of the election held in those portions of said county proposed to be cut off for the purpose of forming the proposed new county of Lee, under the order of his excellency the governor, in tabulated statement of the vote at each precinct, and transmit the same to the secretary of State.

This finding dispenses with the necessity of any inquiry

or finding by the referee on the second issue referred to him.

The case came on for trial before the Supreme Court on the report of the referee on December 19, 1898.

January 6, 1899.   The opinion of the Supreme Court was delivered by

MR. CHIEF JUSTICE MCIVER.   The real object of these proceedings is to determine the validity of the legislation providing for the establishment of Lee County, formulated in an act entitled "An act to establish Lee County," approved 19th of February, 1898—22 Stat., 908, 913.   The mode of proceeding adopted for the purpose of attaining this object was by an application to this Court, in the exercise of its original jurisdiction, for an injunction to restrain the respondents from performing any of the duties or doing any of the acts required of them as commissioners, imposed upon and required of them by the terms of said act.   This application is based upon the ground that the said act is unconstitutional and, therefore, null and void.

We do not propose to consider any of the grounds upon which it is claimed that said act is unconstitutional except one, to wit: that section 2 of art. VII. of the present Constitution was not complied with.   In that article the General Assembly is invested with power to establish new counties in the manner therein prescribed; and section 2 of that article provides, amongst other things, that "No section of the county proposed to be dismembered shall be thus cut off without consent by a two-thirds vote of those voting in such sections," and it is alleged that in Darlington County—one of the counties proposed to be dismembered for the purpose of forming Lee County—such consent was not obtained by a two-thirds vote of those voting in the section proposed to be cut off from Darlington County.   This allegation being denied by the respondents, an issue of fact was thus presented, and hence it became necessary to determine whether the law made any provision, and if so what, by which such

issue of fact should be determined. The Supreme Court, as organized in its ordinary form, not being able to agree as to this matter, all of the Circuit Judges were called to the assistance of the Supreme Court, under the provisions of section 12 of the fifth article of the Constitution, and the Supreme Court as thus organized, sitting *en banc,* heard and determined the question by the opinion of a majority of that tribunal, filed 3d of December, 1898. By reference to that opinion it will be seen that the judgment of a majority of the Supreme Court *en banc* was that the question whether two-thirds of those voting at the election in that section of Darlington County proposed to be cut off for the purpose of forming Lee County, had voted in favor of such new county, could only be properly ascertained in the mode prescribed by the fourth section of an act entitled "An act to provide for the formation of new counties and the changing of county lines and county seats and consolidation of counties," approved 9th of March, 1896—22 Stat., 64, 67—which reads as follows: "The commissioners of elections for each old county proposed to be cut shall canvass the returns of the managers of each precinct in their county at which such election has been held, as such returns in general election in this State are canvassed, and shall certify the result thereof in tabulated statement of the vote at each precinct to the secretary of State, who shall transmit a tabulated statement of the vote at each precinct of an old county proposed to be cut off to both branches of the General Assembly at its next session." After this judgment of the Supreme Court sitting *en banc* was rendered, this Court, as at present organized, passed an order referring it to a referee to inquire and report as to the issues of fact as settled by the judgment of the Supreme Court sitting *en banc.* In obedience to this order the referee has made his report, from which it is very obvious that it does not appear in the manner prescribed by law that two-thirds of those voting in that section of Darlington County, which was proposed to be cut off for the purpose of forming Lee County, voted in favor of the pro-

posed new county of Lee.    Inasmuch, therefore, as it was
not made to appear in the manner prescribed by law, that the
constitutional requirement that "No section of the county
proposed to be dismembered shall be thus cut off without the
consent by a two-thirds vote of those voting in such sec-
tion," so far, at least, as Darlington County is concerned, it
follows necessarily that the General Assembly had no con-
stitutional authority to establish Lee County, embracing as it
does a part of Darlington County, the voters in which had
not signified their consent thereto by the majority required
by the Constitution.

The judgment of this Court is, that the act entitled "An
act to establish Lee County," approved 19th of February,
1898, was passed without constitutional authority, and is
therefore null and void.    And it is further adjudged that
the respondents herein, to wit: J. L. Parrott, John C. Shaw,
J. P. Kilgo, E. E. Tiller, A. E. Skinner, A. M. Lee, R. E.
Carne, W. W. Heron, J. W. Gardiner, J. E. McCutchen, S.
F. Moore, and Wm. Kelly, named as commissioners in said
act, and charged with the performance of certain duties and
the doing of certain acts prescribed in said act, be and they
and each of them are hereby perpetually injoined from per-
forming any of said duties or doing any of said acts.

MR. JUSTICE JONES, *concurring.*    While still entertain-
ing the opinion that the act in question is constitutional, yet
in view of the decision of the Supreme Court *en banc,* by
which I am bound, I concur in the result herein as the logi-
cal result of that decision.